DA 09-0441

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 236

STATE OF MONTANA,

>Plaintiff and Appellee,

v.

JOSHUA DON LARSON,

>Defendant and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC 09-111
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Joslyn Hunt, Chief Appellate Defender; Eileen A. Larkin,
Assistant Appellate Defender, Helena, Montana

For Appellee:

Steve Bullock, Montana Attorney General; C. Mark Fowler,
Assistant Attorney General, Helena, Montana

Fred Van Valkenburg, Missoula County Attorney; Patricia Bower,
Deputy County Attorney, Missoula, Montana

Submitted on Briefs: September 15, 2010

Decided: November 9, 2010

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 In 2009, Joshua Larson was tried and convicted in the District Court for the Fourth Judicial District, Missoula County, of driving a motor vehicle while under the influence of alcohol and/or drugs (DUI). He now appeals on several grounds. We affirm.

## ISSUES

¶2 We restate Larson's issues as follows:

¶3 1. Whether the District Court correctly determined that there was a particularized suspicion to conduct an investigatory stop of Larson's vehicle.

¶4 2. Whether the District Court correctly determined that there was a particularized suspicion to conduct field sobriety tests.

¶5 3. Whether Larson was entitled to *Miranda* warnings during the roadside DUI investigation.

¶6 4. Whether the District Court committed reversible error in admitting opinion testimony from two law enforcement officers regarding the effect of marijuana on Larson's ability to drive safely.

¶7 5. Whether the District Court erred in refusing Larson's proposed jury instruction.

## BACKGROUND

¶8 Just after midnight on September 21, 2008, Sherriff's Deputy Scott King and Deputy Gordon Schmill were conducting a traffic stop just north of the intersection of South Avenue and Reserve Street. The deputies were in separate vehicles, and both had

their respective light bars activated. Both had a clear, unimpeded view of the intersection just to the south.

¶9 During the course of the stop, the deputies became alerted to screeching tires at the nearby intersection. Both looked up to observe Larson's truck spin its tires, and cross the intersection with the engine continually revving. After checking to be sure that Schmill could finish the traffic stop alone, King proceeded to follow Larson down South Avenue. He noticed that Larson's truck had oversized tires and lacked mud flaps. Based upon this and his previous observations at the intersection, King activated his light bar and initiated a stop. In response, Larson made a wide turn onto a side street, causing part of his vehicle to cross into the oncoming traffic lane. He then pulled to the side of the road and parked.

¶10 Immediately upon contact, King observed that Larson slurred his words, spoke slowly, and had a delayed reaction time when asked for his license and registration. While King was checking for existing warrants on Larson and the passengers, Schmill arrived as backup. After King returned Larson's documentation, he inquired whether Larson had consumed any alcohol that evening. Larson answered that he had consumed alcohol earlier in the day. At that point, King requested Larson exit the vehicle to perform field sobriety tests. Larson's sub-par performance further confirmed King's suspicions of impairment, and he requested a breath sample. Larson agreed, was administered a portable breathalyzer test, and blew a .023.

¶11 Due to Larson's low score on the breath test, King became suspicious that Larson was impaired by something other than alcohol. He requested that Larson consent to a

3

search of his vehicle. Larson consented, and then asked why. King explained his concern that Larson might be under the influence of drugs. In response, Larson turned, proceeded to his vehicle, and retrieved a bag of marijuana and a pipe. He subsequently admitted smoking marijuana an hour prior to the stop. King placed Larson under arrest for DUI. Subsequently, Larson refused a request to submit to a blood test.

¶12 Prior to trial, Larson moved to suppress all evidence and statements made during the roadside investigation. He argued that King lacked a particularized suspicion to conduct a stop, lacked a particularized suspicion to justify field sobriety tests and *Miranda* warnings were required prior to his retrieval of the contraband and admission of smoking. The District Court determined that King had a particularized suspicion to conduct the initial traffic stop and that King's subsequent observations gave rise to a particularized suspicion justifying the DUI investigation. The District Court further determined that no *Miranda* warnings were necessary, because Larson's statements were voluntary and no interrogation had occurred. Additionally, the District Court determined that no search was implicated because Larson had voluntarily retrieved the marijuana.

¶13 At trial, both King and Schmill offered testimony that Larson's driving was impaired by marijuana. Larson objected that the testimony constituted expert opinion testimony and neither deputy was qualified as an expert. Although the District Court agreed that neither was an expert, the deputies were permitted to testify as to their observations.

¶14 At the close of evidence, the District Court provided the jury with extensive instructions. At issue on appeal is the final instruction (rebuttable inference instruction):

4

If the person under arrest for driving under the influence of alcohol refused to submit to one or more tests for alcohol and/or drugs concentration, proof of refusal is admissible in any criminal action or proceedings arising out of the act alleged to have been committed while under the influence of alcohol and/or drugs. The trier of fact may infer from the refusal that the person was under the influence. The inference is rebuttable.

Larson submitted a proposed jury instruction to modify the District Court's rebuttable inference instruction. It was materially similar except that it contained a second paragraph that provided:

A test refusal does not, in itself, prove that the person was under the influence of alcohol or drugs at the time he was in control of a motor vehicle. A person may not be convicted based upon a refusal of a blood or breath test alone. The State must produce other competent evidence that the person was under the influence of alcohol or drugs while driving a motor vehicle. You must weigh the evidence presented and decide whether the State has proven beyond a reasonable doubt that the Defendant was under the influence of alcohol or drugs.

Larson argued that his proposed instruction reflected the proper state of the law. The District Court declined to incorporate Larson's proposed instruction and instead went with the original rebuttable inference instruction. On May 12, 2009, the jury found Larson guilty of DUI. Larson appealed to this Court.

**STANDARDS OF REVIEW**

¶15 We review the denial of a motion to suppress evidence to determine whether the district court's findings of fact are clearly erroneous and whether the court correctly applied those findings as a matter of law. *State v. Cooper*, 2010 MT 11, ¶ 5, 355 Mont. 80, 224 P.3d 636. "'A trial court's findings are clearly erroneous if they are not supported by substantial credible evidence, if the court has misapprehended the effect of the evidence, or if our review of the record leaves us with a definite and firm conviction

5

that a mistake has been made.'" *State v. Deines*, 2009 MT 179, ¶ 6, 351 Mont. 1, 208 P.3d 857 (quoting *State v. Lewis*, 2007 MT 295, ¶ 17, 340 Mont. 10, 171 P.3d 731).

¶16    We review a court's evidentiary rulings to determine whether the court abused its discretion. *State v. Nobach*, 2002 MT 91, ¶ 13, 309 Mont. 342, 46 P.3d 618.

¶17    We review jury instructions in a criminal case to determine whether the district court abused its discretion. *State v. Swann*, 2007 MT 126, ¶ 32, 337 Mont. 326, 160 P.3d 511.  A district court has broad discretion when it instructs a jury, but the instructions, as a whole, must fully and fairly instruct the jury on the law applicable to the case.  *Id.*

## DISCUSSION

¶18    *Whether there was Particularized Suspicion to Conduct an Investigatory Stop of Larson's Automobile.*

¶19    Both the Fourth Amendment to the United States Constitution, and Article II, Section 11 of the Montana Constitution prohibit unreasonable searches and seizures. These protections apply to investigative stops of vehicles.  *Cooper*, ¶ 7.  Montana law provides that "a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense."  Section 46-5-401(1), MCA.  The State bears the burden of proving that an officer had particularized suspicion to stop a vehicle by showing: (1) objective data and articulable facts from which an experienced officer can make certain inferences, and (2) a resulting suspicion that the occupant of a certain vehicle is or has been engaged in wrongdoing or was a

6

witness to criminal activity. *Brown v. State*, 2009 MT 64, ¶ 20, 349 Mont. 408, 203 P.3d 842. Whether particularized suspicion exists is dependent upon a totality of the circumstances. *Cooper*, ¶ 7. Consequently, particularized suspicion does not require certainty on the officer's part. *State v. Britt*, 2005 MT 101, ¶ 12, 327 Mont. 1, 111 P.3d 217.

¶20 Larson analogizes his situation to *Grinde v. State*, 249 Mont. 77, 813 P.2d 473 (1991). In *Grinde*, officers observed a vehicle lawfully drive down a street and turn the corner. *Grinde*, 249 Mont. at 78, 813 P.2d at 474. Once the vehicle was out of sight, the officers heard tires squeal and an engine rev. *Id.* This Court ultimately determined that particularized suspicion was lacking because the officers' personal observations were limited to nothing more than a car operating in a "safe and prudent manner." *Grinde*, 249 Mont. at 80, 813 P.2d at 475.

¶21 Unlike the officers in *Grinde*, King's personal observations supported a particularized suspicion of Larson. King was present when the tires first screeched, he watched the truck rev continuously while crossing the intersection, and he observed the oversized tires without mud flaps, a potential violation of § 61-9-407, MCA. Moreover, the driver of the truck opted to engage in this conduct despite being in full view of two officers on the street, and two patrol cars, both of which had their light bars activated.

¶22 Larson further argues that the State cannot rely on the potential mud flap violation because the District Court did not find Larson actually violated the statute. However, King did not need to be certain of a mud flap violation for the purposes of particularized

7

suspicion. *Britt*, ¶ 12. The potential mud flap violation was merely one observation King relied upon in determining that a particularized suspicion existed to conduct a traffic stop.

¶23 The District Court correctly concluded that King had particularized suspicion to stop Larson's truck. Larson screeched his tires and revved his engine continually, while crossing a busy intersection. He did this in plain view of two officers who already had the light bars of their vehicles activated. King subsequently observed that Larson's truck had a potential mud flap violation. These, when taken together with rational inferences, reasonably warranted the stop.

¶24 *Whether there was Particularized Suspicion to Conduct Field Sobriety Tests of Larson.*

¶25 Field sobriety tests constitute a search under both the United States Constitution and the Montana Constitution. *Hulse v. DOJ, Motor Vehicle Div.*, 1998 MT 108, ¶ 38, 289 Mont. 1, 961 P.2d 75; U.S. Const. Amend. IV; Mont. Const. art. II, § 11. Accordingly, field sobriety tests require particularized suspicion that a driver is impaired. *Hulse*, ¶ 38. To establish particularized suspicion for field sobriety tests, a peace officer need not rely solely on the facts supporting the investigative stop. *Id.* at ¶ 40. A lawful stop can escalate based upon an officer's subsequent observations. *Id.* However, the investigation must still remain, "within the limits created by the facts upon which the stop is predicated and the suspicion which they arouse." *Id.*

¶26 Here, the investigation took on an escalating quality, because Larson's post-stop conduct indicated impairment. Before pulling over, Larson made a wide turn onto a side street, causing his truck to cross into the oncoming traffic lane. Upon contact, Larson

8

exhibited slow, slurred speech and had a delayed reaction time. Moreover, Larson admitted that he had been drinking earlier in the day. King made these observations between the time he initiated the stop of the truck and the time he returned Larson's identification. Considering all of these facts together, in the totality of the circumstances the District Court correctly concluded that King had a particularized suspicion that Larson was impaired, and field sobriety tests were justified.

¶27 *Whether Larson was Entitled to Miranda Warnings During the Roadside DUI Investigation.*

¶28 "The Fifth Amendment to the United States Constitution and Article II, Section 25 of the Montana Constitution provide that no person shall be compelled, in any criminal case, to be a witness against himself." *State v. Olson*, 2003 MT 61, ¶ 13, 314 Mont. 402, 66 P.3d 297. "The prosecution may not use statements that stem from a custodial interrogation of a defendant unless the defendant is warned, prior to the questioning, that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Olson*, ¶ 13 (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966)). These warnings have become commonly known as the *Miranda* warnings. *Olson*, ¶ 13.

¶29 Larson argues that he should have received *Miranda* warnings either during the roadside DUI investigation, or after the portable breath test showed he was under the legal limit for alcohol impairment. He contends that the length of his roadside detention exceeded the scope of the investigation and subjected him to a custodial interrogation. Furthermore, he implicitly argues that King's request for consent to search necessitated

9

*Miranda* warnings. The State responds that the investigation was analogous to a Terry stop, and *Miranda* warnings were not required.

¶30 This Court recognizes that "'law enforcement officers need not administer *Miranda* warnings to suspects during brief investigative encounters even if those encounters are somewhat coercive.'" *State v. Hurlbert*, 2009 MT 221, ¶ 34, 351 Mont. 316, 211 P.3d 869 (quoting *State v. Elison*, 2000 MT 288, ¶ 27, 302 Mont. 228, 14 P.3d 456). "[S]tatements made by a defendant in response to an officer's roadside questioning [do] not require warnings of constitutional rights because of the brevity of questioning and its public setting, even though few motorists would feel free to leave." *Elison*, ¶ 29 (citing *Berkemer v. McCarty*, 468 U.S. 420, 436-39, 104 S. Ct. 3138, 3148-49). We have analogized such roadside encounters to "Terry stops," where an officer may ask questions, but the detainee is under no obligation to respond. *State v. Allen*, 1998 MT 293, ¶ 11, 292 Mont. 1, 970 P.2d 81. Furthermore, a request for field sobriety tests, without interrogation, does not subject a detainee to a custodial interrogation. *State v. Stanczak*, 2010 MT 106, ¶ 9, 356 Mont. 263, 232 P.3d 896 (citing *State v. Van Kirk*, 2001 MT 184, ¶ 22, 306 Mont. 215, 32 P.3d 735).

¶31 Larson was not entitled to *Miranda* warnings during the roadside DUI investigation. Larson analogizes his situation to *State v. Elison*, arguing that detentions lasting more than five to ten minutes are unreasonable. However, *Elison* merely affirmed our prior conclusions that roadside investigations are not custodial interrogations so long as officers keep the scope of an inquiry reasonably related to the purpose for which the investigation was initiated. *Elison*, ¶¶ 31-33. Moreover, we have explicitly declined to

10

define specific time parameters for roadside investigatory stops, because reasonableness is dependent upon specific circumstances. *State v. Nelson*, 2004 MT 310, ¶ 23, 323 Mont. 510, 101 P.3d 261 (24-minute DUI investigation, including field sobriety tests and arrest, was reasonable); *State v. Sharp*, 217 Mont. 40, 47, 702 P.2d 959, 963 (1985) ("Drawing artificial distinctions or 'time lines' in situations such as these does not comport with reality or common sense.").

¶32 Larson's roadside detainment remained public, routine and temporary in nature, never exceeding the scope of a DUI investigation. *Allen*, ¶ 13. Larson's initial conduct and responses to King's questions justified field sobriety tests. The record reflects that Larson was not interrogated while performing those tests. When King did ask questions, they were confined to the context of an ongoing DUI investigation. *Elison*, ¶ 32 ("an officer may ask the detainee a moderate number of questions to determine the detainee's identity and to try to obtain information confirming or dispelling the officer's suspicions before the requirements of *Miranda* attach"). Furthermore, Larson extended his roadside detention by volunteering to take a portable breath test.

¶33 We disagree with Larson's contention that his breath test results ended the investigation and subjected him to *de facto* custody. This is the type of artificial distinction we have declined in the past. *Sharp*, 217 Mont. at 47, 702 P.2d at 963. The record reflects that subsequent to the breath test, King remained concerned about Larson's ability to drive. As a result, King made brief, reasonable, inquiries about drugs as potential sources of impairment. *State v. Seaman*, 2005 MT 307, ¶ 29, 329 Mont. 429, 124 P.3d 1137 ("for law enforcement officers to effectively discharge their duties, they

11

must be given some latitude to react to and follow up on their observations"). Despite King's change of focus following the breath test, nothing distinguishes this situation from previous traffic stops. *Allen*, ¶¶ 12-14; *Elison*, ¶ 33. Based on the foregoing, we determine Larson's roadside detainment was a reasonable DUI investigation, and no *Miranda* warnings were required.

¶34 Furthermore, Larson fails to demonstrate that the District Court erred in finding his conduct voluntary. The entire roadside interaction between Larson and the officers was devoid of indications of involuntariness we have considered in the past. Larson does not offer evidence that King employed violence, threats, or made direct or implied promises. *State v. Scarborough*, 2000 MT 301, ¶ 32, 302 Mont. 350, 14 P.3d 1202. Moreover, there is no indication that Larson was lied to or subjected to any condemned police practice. *State v. Phelps*, 215 Mont. 217, 224-25, 696 P.2d 447, 451 (1985). On the contrary, counsel for Larson actively elicited testimony highlighting Larson's cooperativeness with the investigation. Thus, we conclude that the District Court did not err when it found Larson's retrieval of the marijuana and admission that he had smoked it, entirely voluntary.

¶35 Finally, we note that King's request for consent to search did not implicate Larson's right against self-incrimination. "Consent to a search is not an incriminating statement; it is not testimonial or communicative in nature, thus it is not protected by the Fifth Amendment." *Hurlbert*, ¶ 35 (citing *U.S. v. Lemon*, 550 F.2d 467, 472 (9th Cir. 1977)). Furthermore, the District Court correctly concluded that no search was at issue, because Larson personally retrieved the marijuana and pipe after being asked for consent

12

to search. *State v. Graves*, 191 Mont. 81, 90, 622 P.2d 203, 208 (1981), overruled in part by *State v. Daniels*, 210 Mont. 1, 16, 682 P.2d 173, 181 (1984) (no search where officer asked about defendant's use of a knife and defendant immediately handed the officer a knife).

¶36 *Whether the District Committed Reversible Error in Admitting Opinion Testimony from Deputies King and Schmill Regarding the Effect of Marijuana on Larson's Ability to Drive Safely.*

¶37 As a threshold matter, Larson posits that "The District Court Erred by Denying Larson's Motion to Dismiss for Lack of Competent Corroborating Evidence of Driving While Impaired by Marijuana," but provides no support for this position. Instead, his ensuing discussion focuses on whether the District Court abused its discretion by allowing the deputies to offer opinion testimony on marijuana impairment. This Court neither considers unsupported issues nor undertakes the obligation to formulate arguments for a party on appeal. *State v. Miller,* 2008 MT 106, ¶ 15, 342 Mont. 355, 181 P.3d 625. As a result, we will only address Larson's evidentiary contentions.

¶38 The Montana Rules of Evidence allow for the admission of both lay opinion and expert opinion testimony. Lay witness testimony is permitted for opinions or inferences rationally based on the perception of the witness and helpful to a clear understanding of the witness' testimony or the determination of a fact in issue. M. R. Evid. 701. Expert opinion testimony is admissible on issues of "scientific, technical or other specialized knowledge," so long as two requirements are met: (1) the opinion will assist the trier of fact in understanding the evidence or determining a fact in issue, and (2) the witness is

13

qualified as an expert through knowledge, skill, experience, training or education. M. R. Evid. 702. We first turn to the issue of whether the testimony given by deputies King and Schmill was lay or expert opinion testimony.

*a. Lay or Expert Opinion Testimony*

¶39 We have held that opinion testimony regarding a defendant's ability to drive safely due to drug consumption is expert opinion testimony requiring a foundation under M. R. Evid. 702. *Nobach*, ¶ 22. In *State v. Nobach*, we reasoned that lay persons are not "sufficiently knowledgeable about common symptoms of drug consumption, much less the effects of drug consumption on a person's ability to drive a motor vehicle safely, to offer lay opinion testimony on those subjects, based upon personal observations." *Id.* at ¶ 17. Moreover, we analogized such testimony to opinions offered regarding the horizontal gaze nystagmus test and found a similar need for proper foundation based upon training or education. *Id.* at ¶ 21.

¶40 At trial, Schmill and King each gave opinion testimony regarding Larson's ability to drive safely due to marijuana impairment. On direct, King's relevant testimony was:

> [King]: Okay. Starting with the -- the pealing out through the intersection, aggressive driving, through the wide turn before he came to the stop, passing over in the oncoming traffic lane there, the slowed and slurred speech and reactions, the -- the poor performance of the standardized field sobriety tests, maneuvers, and then the admission, and then of course him producing the bag of marijuana and the pipe, there was no doubt in my mind that his impairment was due to being under the influence of marijuana.
>
> [County Attorney]: So based on all of those observations during your interaction with the defendant, do you have an opinion as to whether he was impaired?

14

[King]:  I do.

[County Attorney]:  And what is that opinion?

[King]:  That he was impaired by marijuana.

Schmill offered his opinion regarding the effects of marijuana impairment on driving:

[County Attorney]:  Okay.  And based on your training and experience, if someone is impaired by marijuana, are they able to have all of their attention on all of the different things that they need to at the time to be a safe driver?

[Schmill]:  No.  I don't believe so.

Schmill also opined that Larson's driving was impaired due to marijuana:

[County Attorney]:  And based on your observations that night and the observations that Deputy King told you he made, putting all the pieces of the puzzle together that night, did you feel the defendant was impaired by marijuana?

[Schmill]:  I do.

Based upon the foregoing, it is clear that both deputies provided opinion testimony regarding Larson's ability to drive safely as a result of consuming marijuana.

¶41   The State attempts to distinguish *Nobach*, arguing that the holding was limited to prescription drugs in a non-DUI context.  However, such a narrow distinction is not in accord with the reasoning behind *Nobach*.  Time may come where the average lay person will be able to opine as to the effects of marijuana consumption on motor vehicle operation, but for now the reasoning of *Nobach* is sound.  We conclude the deputies'

15

opinions that Larson's driving was impaired due to marijuana consumption were expert opinions that required adequate foundation under M. R. Evid. 702.[1]

*b. Foundation*

¶42    Larson argues that the District Court determined that Schmill and King were not experts and, as a result, there was no foundation for their opinions regarding whether Larson's driving ability was impaired by marijuana.  The State counters that there was sufficient foundation laid concerning the officers' training and experience in discerning the effects of marijuana impairment on the ability to drive safely.  We conclude that there was inadequate foundation for the deputies' opinions regarding Larson's ability to drive safely based upon marijuana impairment.

¶43    Montana Rules of Evidence 702 requires foundation that the expert has adequate knowledge, skill, experience, training or education upon which to base an opinion.  *State v. Stout,* 2010 MT 137, ¶ 59, 356 Mont. 468, 237 P.3d 37.  The witness must demonstrate specialized knowledge which distinguishes him or her from a lay person.  *Id.*  In *State v. Gregeroff,* 287 Mont. 1, 951 P.2d 578 (1997), we found a sufficient foundation had been laid for expert testimony regarding accident causation, because the witness was an eight-year law enforcement veteran, had attended two-week investigation courses, had taught courses on accident investigation to other academies, and had specialized DUI training.  *Gregeroff,* 287 Mont. at 4, 951 P.2d at 580.  On the other hand, in *Nobach*, we found

---

[1] Both deputies, based on their personal observations, could have testified pursuant to M. R. Evid. 701 that Larson's driving was impaired. *See State v. Frasure,* 2004 MT 305, ¶ 17, 323 Mont. 479, 100 P.3d 1013.  The addition of the testimony that Larson's driving was impaired by marijuana invoked the foundational requirements of M. R. Evid. 702.

insufficient foundation for expert opinion regarding the ability to drive under drug impairment, because the officer only had three days of academy drug training, and no training or experience with the specific type of prescription drugs. *Nobach*, ¶¶ 25-26.

¶44 There was inadequate foundation to admit King's expert opinion that Larson's ability to drive was impaired by marijuana. King described his duties as crime control, investigation, traffic control and general patrol. He testified that he was not a Drug Recognition Expert as approved by the National Highway Traffic Safety Administration. Furthermore, King testified to limited drug training:

> [County Attorney]: Okay. And can you tell me what training you've received as far as the detection of drugs goes?
>
> [King]: Also during the academy, we were given a drug recognition course. I don't recall how long it is or the amount of time that we spend on that subject.
>
> [County Attorney]: Okay. During that course do you learn what some of the factors are regarding marijuana impairment?
>
> [King]: Yes.
>
> .   .   .
>
> [Defense Counsel]: Can you show me where in this manual, which is the NHTSA manual you've admitted you've been tested on, where peeling out is an indicator of impairment due to marijuana.
>
> [King]: It's not in the manual.
>
> [Defense Counsel]: Can you show me where a wide turn is an indicator due to marijuana?
>
> [King]: This reference is for sobriety for alcohol.
>
> [Defense Counsel]: Which is in fact all the training you've had.

17

[King]: Correct. Minus a small class during the academy on the recognition of drugs.

¶45 With regard to his experience, King testified that he had never before done a DUI-drug investigation as a solo officer. Although King testified to prior involvement in marijuana arrests, he had no experience with impaired driving due to marijuana consumption. Moreover, although King testified to learning some of the indicators of marijuana impairment during training, he failed to identify any. Without more, King could not qualify as an expert for the purposes of M. R. Evid. 702.

¶46 Likewise, there was improper foundation to admit Schmill's expert opinion that Larson's driving was impaired due to marijuana. Like King, Schmill was not a Drug Recognition Expert approved by the National Highway Transportation Safety Administration. Schmill did have slightly more training than King:

[County Attorney]: Did you receive any specialized training in the field of DUI detection or investigation?

[Schmill]: I did.

[County Attorney]: Could you describe that training?

[Schmill]: One of those trainings involved eight hours of training with the Missoula Police Department and detection of alcohol and drug for DUIs and just drugs in general.

[County Attorney]: And what did you learn about the detection of marijuana during this training?

[Schmill]: The training I learned was that the detection of marijuana is something similar to someone who's been impaired by alcohol and -- and that is I've learned that if you're impaired by a certain type of drugs, some drugs you have what they call a horizontal gaze nystagmus, HGN, and some does not. I've learned that some drugs will react you'll have three indicators for the walk-and-turn. You'll -- it will -- it will have indicators

for that. You'll have indicators for the one-leg stand. Some of the -- some of the other indicators: you'll have bloodshot, glassy eyes; your movement's slow; you know, slurred speech. Stuff -- something similar to someone who is impaired by alcohol.

However, on cross-examination, Schmill's testimony demonstrated shortfalls in his training:

> [Defense Counsel]: And you're of course aware that NHTSA doesn't recognize any of the field sobriety tests as indicative of impairment due to marijuana.
>
> [Schmill]: Not that I know of. I don't know.
>
> [Defense Counsel]: And -- well, you've been trained at the academy –
>
> [Schmill]: Right. For alcohol.
>
> [Defense Counsel]: -- pursuant to NHTSA standards.
>
> [Schmill]: Uh-huh.
>
> [Defense Counsel]: And nowhere in that training were you told that any of those field sobriety scores could be indicative of impairment due to another drug or marijuana.
>
> [Schmill]: Not to my recollection.
>
> .  .  .
>
> [Defense Counsel]: So you can't tell me how marijuana impairs an individual absent this correlation you were taught at this class.
>
> [Schmill]: Nope.
>
> [Defense Counsel]: You can't tell me any sort of driving cues that you might observe.
>
> [Schmill]: They didn't give us anything like if they're going to drive wrong or whatever.

[Defense Counsel]: Sure. Well, there's -- there's 20 driving cues that you might observe when somebody's under the influence of. You weren't given anything like that for marijuana.

[Schmill]: No.

[Defense Counsel]: You weren't given any sort of field sobriety tests that can be used to determine whether somebody is at a certain marijuana blood content or-

[Schmill]: No. Just that they'd be similar to your -- like your one-leg stand and your walk-and-turn.

¶47 Schmill also testified to a lack of field experience dealing with marijuana impairment. He acknowledged being involved in only five or six marijuana cases and confirmed that in three of them, an outside drug recognition expert had been called in to make impairment determinations. Furthermore, he conceded that he could not distinguish between burnt and raw marijuana.

¶48 We hold that the foundation regarding King and Schmill's training and experience was insufficient to demonstrate the special training or education, and adequate knowledge upon which to base an expert opinion as required by M. R. Evid. 702. Their respective trainings involved only brief exposure to recognition of drug impairment. Each demonstrated uncertainty in identifying specific indications of marijuana impairment. Moreover, Schmill compared marijuana impairment to alcohol impairment, but testified that that he had no basis for doing so. The two deputies pointed to few practical field experiences dealing with marijuana, let alone interactions with drivers impaired by marijuana. As a result, it was error on the part of the District Court to admit the deputies' expert opinions regarding Larson's ability to drive due to marijuana impairment.

20

*c. Whether the Error was Prejudicial*

¶49    We now turn to the issue of whether the District Court's error in admitting the deputies' expert testimony was prejudicial, i.e., not harmless, to Larson. This Court utilizes a two-step analysis to determine whether error was prejudicial to a criminal defendant's right to a fair trial and mandates reversal. *Van Kirk*, ¶ 37. First, we inquire whether the error is "structural" error or "trial" error. *Id.* Structural error is error that "affects the framework within which a trial proceeds; it typically is of constitutional dimension, precedes the trial, and undermines the fairness of the entire trial proceeding." *Nobach*, ¶ 27. Examples include errors in jury selection, deprivation of the right to counsel, and lack of an impartial judge. *Van Kirk*, ¶ 39. If the error was structural, the inquiry ends and the verdict reversed. *Id*. at ¶ 41. On the other hand, if the error is trial error, we proceed to the second step and inquire whether the error was prejudicial. *Id.* Trial error typically occurs during presentation of the case, and includes improper admission of evidence. *Nobach*, ¶ 27.

¶50    Based upon the foregoing, the erroneous admission of the deputies' expert opinions during trial constituted trial error. We assess trial error under our harmless error statute, § 46-20-701(1), MCA, in order to determine the prejudicial impact with regard to the other evidence produced at trial. *Van Kirk*, ¶ 40. To do this, we utilize the "cumulative evidence" test. *Id*. at ¶ 43. Under this test, the State must show that the jury was presented with "admissible evidence that proved the same facts as the tainted evidence and, qualitatively, by comparison, the tainted evidence would not have contributed to the conviction." *Id*. at ¶ 47.

21

¶51 The expert opinions were offered as proof that Larson's driving was impaired by marijuana. Thus, to satisfy the "cumulative evidence" test the State must meet two requirements. First, the State must point to other admissible evidence demonstrating that Larson's ability to operate his truck was impaired by marijuana. Second, the State must demonstrate that qualitatively, no reasonable possibility exists that the erroneously-admitted opinions might have contributed to Larson's conviction. We conclude that the State has satisfied both requirements.

¶52 First, the State has shown other admissible evidence demonstrating that Larson's ability to operate his vehicle safely was impaired by marijuana. The deputies' non-expert testimony provided the jury with observations of Larson's impairment. Both King and Schmill testified to Larson's clear lack of judgment when he screeched the truck's tires and revved the engine, in plain sight of two officers and two patrol vehicles with activated light bars. King testified to Larson's wide turn into the oncoming lane, his slow and slurred speech, and delayed reaction time. Larson told King he had consumed alcohol earlier in the day, and his performance on the field sobriety tests indicated impairment. Based upon these facts, the jury certainly could have concluded Larson's driving was impaired. Additionally, the jury was presented with admissible evidence that Larson's impairment was due to marijuana. Larson voluntarily produced a bag of marijuana and a pipe, and admitted that he had smoked an hour earlier. Furthermore, Schmill testified to an odor of marijuana and Larson's bloodshot, glassy eyes. Thus, the jury was presented with other admissible evidence that allowed it to conclude Larson's driving was impaired by marijuana.

¶53 Second, in comparison to the admissible evidence, there is no reasonable possibility that the erroneously-admitted expert testimony contributed to Larson's conviction. Each deputy clearly conveyed his respective lack of familiarity with marijuana. The jury heard each admit to a deficiency in training and experience with regard to marijuana impairment. On cross-examination, Larson demonstrated that neither deputy was qualified to offer opinions regarding marijuana's impact on the ability to drive. We conclude that the erroneously-admitted expert opinions were harmless and did not prejudice Larson's right to a fair trial.

¶54 *Whether the District Court Properly Refused Larson's Proposed Jury Instruction.*

¶55 Larson argues that the District Court's rebuttable inference jury instruction failed to accurately state the law, because it did not explain that the State had a burden of proof beyond the rebuttable inference. He argues that in the absence of such an instruction, a jury does not know how to construe the word "rebuttable," and is permitted to convict a defendant solely on the basis of the rebuttable inference. Furthermore, Larson posits that that this issue was not raised in, and is not controlled by, either *State v. Michaud*, 2008 MT 88, 342 Mont. 244, 180 P.3d 636, or *Great Falls v. Morris*, 2006 MT 93, 332 Mont. 85, 134 P.3d 692. The State responds that the jury instructions, as a whole, properly advised the jury as to the State's burden of proof and explained how the jury was permitted to consider Larson's refusal to submit to a blood test.

¶56 Section 61-8-404, MCA, governs the admissibility of, and weight given to, evidence in a DUI trial. We have previously interpreted this statute to demand competent corroborating evidence of impairment, beyond drug test results or a defendant's refusal to

23

submit to a drug test. *Morris*, ¶ 21; *Michaud*, ¶ 49. Larson posits that our prior decisions mandate an explicit jury instruction that explains the State's burden to provide competent corroborating evidence. We disagree.

¶57 In *State v. Miller*, we were faced with the issue of whether a district court abused its discretion by failing to explicitly tell the jury that the State needed to provide competent corroborating evidence other than the rebuttable inference. *Miller*, ¶ 17. The specific jury instruction at issue in *Miller* provided:

> If a person refuses to submit to a physical test or a test of their breath or blood for alcohol concentration, such a refusal is admissible evidence. You may infer from the refusal that the person was under the influence. The inference is rebuttable.

*Id.* at ¶ 7. Miller argued that absent a "competent corroborating evidence" instruction, the district court turned the permissive inference from § 61-8-404(2), MCA, into a mandatory presumption, creating an unconstitutional burden shift. *Id.* at ¶ 19.

¶58 We rejected Miller's argument, reasoning that when the jury instructions were viewed as a whole, they fully and fairly set forth the applicable law and did not result in an unconstitutional burden shift. *Id.* at ¶ 23. The jury was informed that they were to consider all of the instructions as a whole, Miller was presumed innocent throughout the entire trial, the State had the burden to overcome that presumption beyond a reasonable doubt, based upon all the evidence, and Miller was not required to present any evidence. *Id.* at ¶¶ 22-23. Furthermore, the jury was instructed as to the specific elements of the DUI offense. *Id.* at ¶ 22. We concluded that the lack of an explicit instruction regarding

24

"competent corroborating evidence" was compensated for by the other instructions given to the jury. *Id*. at ¶ 24.

¶59 *Miller* is applicable to the case at hand. The District Court's rebuttable inference instruction is materially indistinguishable from the one given in *Miller*. Moreover, Larson's jury was instructed (1) to consider all of the instructions as a whole, (2) that Larson was presumed innocent throughout the proceedings, (3) that the State had the burden to prove Larson's guilt beyond a reasonable doubt, based upon all the evidence, (4) that Larson was permitted to not testify or offer evidence, and (5) that each element of the DUI offense had to be proved beyond a reasonable doubt. Thus, when viewed as a whole, the instructions fully and fairly instructed the jury regarding the applicable law. The District Court did not abuse its discretion by rejecting Larson's proposed jury instruction.[2]

¶60 Finally, based upon the evidence before the jury, Larson was not convicted solely on the basis of his refusal to submit to a blood test. Sufficient corroborating evidence of impairment was presented, including Larson's screeching and squealing of tires across the intersection while in plain view of two officers, the truck's wide turn into oncoming traffic, Larson's slow reactions, slurred speech, earlier consumption of alcohol, and poor performance on the field sobriety tests. Moreover, the jury heard that Larson retrieved a bag of marijuana and a pipe, and told the officers that he had smoked an hour prior. The

---

[2] While we hold that the District Court's refusal of Larson's proposed instruction (quoted in ¶ 14) was not an abuse of discretion, we do not say that the proposed instruction should not be given. To the contrary, the second paragraph of Larson's proposed instruction is an accurate, instructive statement of the law in Montana and could be helpful to the trier of fact in future cases.

jury was well aware of their duty to consider all of this evidence. In light of the corroborating evidence presented, we cannot say the jury convicted Larson solely on his refusal to submit to a blood test.

¶61    Affirmed.

/S/ MIKE McGRATH

We concur:

/S/ BRIAN MORRIS
/S/ MICHAEL E WHEAT
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE