FILED

05/09/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0166

DA 22-0166

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 79

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

DAKOTA SCHLICHENMAYER,

       Defendant and Appellant.

APPEAL FROM:   District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC-20-321C
Honorable John C. Brown, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jami L. Rebsom, Jami Rebsom Law Firm PLLC, Livingston, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Bjorn E. Boyer, Assistant Attorney General, Helena, Montana

          Audrey Cromwell, Gallatin County Attorney, Bozeman, Montana

Submitted on Briefs:  March 29, 2023

Decided:  May 9, 2023

Filed:

_____
                Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Dakota Schlichenmayer (Schlichenmayer) was charged with Criminal Endangerment, Driving Under the Influence of Alcohol (DUI), and Partner or Family Member Assault. She appeals the denial of her suppression motions entered in the Eighteenth Judicial District Court, Gallatin County. Schlichenmayer filed (1) a Motion to Suppress for Lack of Particularized Suspicion, (2) a Motion to Suppress Breath Test, and (3) a Motion to Suppress Statements.

¶2 We affirm and restate the issues as follows:

1.  *Were there sufficient articulable facts to conduct an investigatory stop?*

2.  *Were there sufficient articulable facts to conduct a DUI investigation?*

3.  *Did the District Court err in concluding Schlichenmayer's statements to law enforcement were voluntary?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On May 25, 2020, at approximately 8:40 p.m., Joshua Brunnette (Brunnette) called Gallatin County dispatch stating a female had crashed a white vehicle on Lagoon Road in Belgrade, Montana, and appeared to be intoxicated.

¶4 Officers Bernard Capulong and John Owens responded and observed a vehicle was partially in the ditch and was high centered. Officer Capulong believed the vehicle could not move. The back driver's side bumper was partially obstructing the southbound lane of traffic. The vehicle was in a borrow pit on a straight portion of the road. There were no obstructions on the road and weather was not a contributing factor to the accident.

¶5 Officer Capulong first contacted Schlichenmayer while she was sitting in the driver's seat of the vehicle. He asked if she was okay and whether she needed any medical attention. Schlichenmayer responded no by shaking her head but appeared to be very emotional. She informed Officer Capulong that she had called a tow truck and told the officers to go away. Officer Capulong was uncertain about Schlichenmayer's welfare and was concerned the car was creating a traffic hazard on the roadway. Officer Capulong told Schlichenmayer that dispatch had received a call about an erratic driver stuck in a ditch.

¶6 Schlichenmayer explained that her boyfriend was initially driving the vehicle when they got into an argument. Her boyfriend, Edgar Andino-Artiaga (Andino), pulled the vehicle over and began walking away. Schlichenmayer admitted to Officer Capulong that she used her vehicle to look like she was going to hit Andino so he would be scared. Schlichenmayer said Andino threw a rock at the vehicle, cracking the windshield. Andino left Schlichenmayer in the vehicle and walked to his mother's home in a nearby neighborhood.

¶7 Next, Schlichenmayer unexpectedly exited her vehicle and, while crying, walked about 20 to 30 feet away. Officer Capulong did not prevent her from walking away and, instead, discussed his investigation with Officer Owens. The officers overheard Schlichenmayer call someone and tell them she had tried to scare Andino by acting like she was going to hit him with the vehicle. After the phone call, Schlichenmayer returned to the officers and inquired about their "plan." The officers told her they needed to locate Andino to understand his side of the story. Schlichenmayer volunteered her story again,

3

explaining Andino was walking away when she tried to scare him by pretending she was going to hit him with her car.

¶8 While speaking with Schlichenmayer, Officer Capulong observed she had red bloodshot eyes and could smell alcohol on her breath. Schlichenmayer voluntarily told Officer Capulong she had consumed "a couple" of beers prior to driving. During the encounter, she was overly emotional and struggled to follow basic verbal instructions. Schlichenmayer's behavior indicated she was impaired and under the influence of alcohol. Accordingly, Officer Capulong informed Schlichenmayer she was no longer free to leave the scene.

¶9 Officer Paul Wilson located Andino and returned him to the scene. Andino told Officer Wilson that Schlichenmayer hit him in the face during their argument, which is why he exited the vehicle and walked away. Officer Wilson observed Andino had a swollen and bloody lip. Andino explained further that Schlichenmayer drove the car toward him trying to hit him. Andino told Officer Capulong he had to "jump" out of the way so Schlichenmayer would not hit him. Andino's sister also arrived on the scene and requested to speak to the officers. She confirmed both Andino and Schlichenmayer had been drinking at her mother's house.

¶10 Officer Capulong arrested Schlichenmayer for criminal endangerment. Schlichenmayer became belligerent and started screaming for Andino's sister to bail her out. While Schlichenmayer was in the patrol vehicle, she berated the officers and unbuckled her seatbelt. The officers ignored her. After arriving at the detention center,

the officers asked Schlichenmayer to perform standard field sobriety tests (SFSTs). Based on her performance, Officer Capulong informed Schlichenmayer he believed she had been driving under the influence. Officer Capulong then requested Schlichenmayer take a breath test. She replied voluntarily, without any questioning, that "I already told you guys I drank three or four beers" and asked that they not cite her for DUI. She began to hit and kick the walls and had to be handcuffed. She continued to yell, swear, and hyperventilate. Eventually Schlichenmayer calmed down and performed a preliminary breath test, which resulted in a breath alcohol content (BAC) of 0.089. She provided another breath sample, which resulted in a BAC of 0.099. During this time at the detention center and while performing SFSTs and breath tests, the officers did not interrogate her.

## STANDARD OF REVIEW

¶11 We review a district court's grant or denial of a motion to suppress to determine whether the court's findings are clearly erroneous and whether those findings were applied correctly as a matter of law. *State v. Gill*, 2012 MT 36, ¶ 10, 364 Mont. 182, 272 P.3d 60. "A finding is clearly erroneous if it is not supported by substantial credible evidence, if the trial court misapprehended the effect of the evidence," or the record leaves this Court with the "firm or definite conviction that the trial court made a mistake." *State v. Carrywater*, 2022 MT 131, ¶ 11, 409 Mont. 194, 512 P.3d 1180.

## DISCUSSION

¶12 *Were there sufficient articulable facts to conduct an investigatory stop?*

¶13 Schlichenmayer argues the officers' observations of her vehicle in the ditch and Officer Capulong's conversation with her did not support particularized suspicion because she immediately told the officers that she did not need help and the officers, at that point, had no articulable facts to support particularized suspicion. Schlichenmayer contends the officers prolonged their investigation asserting there was no lawful reason for officers to remain on the scene or to conduct a DUI investigation once they confirmed Schlichenmayer was not in immediate danger.

¶14 The Fourth Amendment to the United States Constitution, and the Montana Constitution, Article II, Section 2, protects citizens from unreasonable searches and seizures. *State v. Zeimer*, 2022 MT 96, ¶ 23, 408 Mont. 433, 510 P.3d 100. A person is constitutionally "seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave." *State v. Case*, 2007 MT. 161, ¶ 24, 338 Mont. 87, 162 P.3d 849.

¶15 Law enforcement officers may conduct an investigatory stop if the officer has a particularized suspicion that the person has committed, is committing, or is about to commit a criminal offense. Section 46-5-401(1), MCA. Without a warrant, officers may briefly stop and detain a person for investigative purposes or probable cause for an arrest if, based on specific and articulable facts known to the officer, the officer has an objectively reasonable, particularized suspicion that the person is engaged, or is about to engage, in criminal activity. *State v. Elison*, 2000 MT 288, ¶ 15, 302 Mont. 228, 14 P.3d 456. The

6

State must show: "(1) objective data from which an experienced officer could make certain inferences, and (2) a resulting suspicion that the [suspect] in question is or has been engaged in some wrongdoing." *State v. Trombley*, 2005 MT 174, ¶ 9, 327 Mont. 507, 116 P.3d 771. "[P]articularized suspicion does not require that the law enforcement officer be certain that an offense has been committed." *State v. Henderson*, 1998 MT 233, ¶ 12, 291 Mont. 77, 966 P.2d 137. Rather, courts must look at the totality of the circumstances to determine if the officer had the objective data necessary to justify the stop. *Henderson*, ¶ 12.

¶16 A stop "may not last longer than is necessary to effectuate the purpose of the stop." Section 46-5-403, MCA. However, if additional objective data of wrongdoing exists, a stop may be prolonged, and the scope of the investigation may be broadened, only if the investigation remains within the limits created by the facts and the suspicions from which they arose. *State v. Wilson*, 2018 MT 268, ¶ 25, 393 Mont. 238, 430 P.3d 77. If, while investigating the reason for the initial stop, the officer gains particularized suspicion that additional crimes are being committed, the officer may continue to investigate those additional crimes. *Case*, ¶ 34. To enlarge the scope of the investigation from the original seizure to an investigation of other crimes, law enforcement must show "additional objective data of wrongdoing." *State v. Hulbert*, 2009 MT 221, ¶ 21, 351 Mont. 316, 211 P.3d 869.

¶17 Upon contacting Schlichenmayer, Officer Capulong observed she was intoxicated; he could smell alcohol on her breath and he observed her red bloodshot eyes. Andino's

7

sister confirmed Schlichenmayer had been drinking, and Schlichenmayer herself admitted consuming alcohol. Officer Capulong also observed Schlichenmayer had driven into a borrow pit on a straight and dry stretch of the road without any obvious explanation. Officer Capulong observed Schlichenmayer acting erratically and emotionally. We conclude these observations provided specific and articulable facts that indicated to the officers Schlichenmayer was under the influence. Based on his observations, Officer Capulong had particularized suspicion to investigate Schlichenmayer for DUI.[1]

¶18 Further, once Schlichenmayer explained she had driven into the ditch because she was intentionally driving her car at Andino, there was particularized suspicion to investigate Schlichenmayer for criminal endangerment. Andino corroborated Schlichenmayer's statements that she was trying to hit him. Accordingly, there was abundant objective data suggesting Schlichenmayer had also committed the crime of criminal endangerment. The District Court's finding that the officers had particularized suspicion for Schlichenmayer's seizure was not clearly erroneous.

¶19 Schlichenmayer nonetheless argues that the investigation was prolonged because she told the officers she was okay and did not need medical attention. However, "the community caretaker doctrine is an exception to the warrant requirement for seizures, analogous to [an] investigative stop." *State v. Graham*, 2007 MT 358, ¶¶ 25-26, 340 Mont. 366, 175 P.3d 885. The underlying rationale to allow for a seizure under the community

---

[1] Because the officers made independent observations that gave rise to particularized suspicion, it is not necessary to address Brunnette's call to dispatch and whether it contributed to the officers' particularized suspicion.

caretaker doctrine is to allow "swift action predicated upon the on-the-spot observations of the officer on the beat, [which] historically has not been and as a practical matter could not be, subjected to the warrant procedure." *State v. Spaulding*, 2011 MT 204, ¶ 18, 361 Mont. 445, 259 P.3d 793 (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879 (1968)).

¶20 We use the following test to determine whether the community caretaker doctrine will apply:

> First, as long as there are objective, specific, and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate. Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure which must be justified by something other than the community caretaker doctrine, such as particularized suspicion or probable cause.

*Spaulding*, ¶ 21; *Graham*, ¶ 25; *State v. Lovegren*, 2002 MT 153, ¶ 25, 310 Mont. 358, 51 P.3d 471. The analysis is not based on an officer's subjective reasons for making the stop, but, rather, is based on "objective, specific, and articulable facts from which an officer would suspect that a citizen is in need of help or is in peril." *Spaulding*, ¶ 24. There is "no requirement that the officer's subjective purpose be solely and exclusively to conduct a welfare check." *Spaulding*, ¶ 24. "Community caretaker functions exercised by police officers may include assisting motorists who are stranded, involved in accidents, or otherwise in need of assistance." *State v. Marcial*, 2013 MT 242, ¶ 13, 371 Mont 348, 308 P.3d 69 (internal quotation marks omitted). However, an officer may not use the community caretaker doctrine as a pretext to investigate a crime in the absence of

9

particularized suspicion—"the stop [must] actually involve a welfare check." *Spaulding*, ¶ 24; *see also Graham*, ¶¶ 30-31.

¶21 Here, Schlichenmayer crashed her vehicle into the borrow pit. The officers observed the vehicle's front two tires in the ditch and the rest of the immovable vehicle partially obstructing the southbound traffic lane. Once observing the vehicle in this state, the officers had a duty to stop to ensure Schlichenmayer was okay or to see if she needed medical attention. Although Schlichenmayer wanted the officers to leave, they could not because a "peril" remained that the officers were obligated to address—that is, Schlichenmayer's vehicle obstructing the road and presenting a risk to other motorists. Officer Owens testified he was concerned Schlichenmayer's vehicle was a "traffic hazard" and that he wanted to "make sure nobody hits the vehicle because it is in the [traffic] lane." The welfare check was not a pretext. This initial welfare check ripened into a criminal investigation when Officer Capulong developed particularized suspicion based on objective data to investigate Schlichenmayer for a DUI and criminal endangerment. The District Court did not err in finding Officer Capulong's initial contact with Schlichenmayer was justified by the community caretaker doctrine, and that her seizure was proper. We affirm the denial of her Motion to Suppress for Lack of Particularized Suspicion.

¶22 *Were there sufficient articulable facts to conduct a DUI investigation?*

¶23 Schlichenmayer argues the SFSTs constituted an illegal search, and as a result, the evidence obtained from the SFSTs and breath tests should be suppressed.[2] Schlichenmayer

---

[2] The State maintains that Schlichenmayer did not specifically preserve her motion to suppress

10

argues the officers should have conducted the SFSTs at the roadside rather than the jail. She offers no authority to support this proposition. Once an officer has particularized suspicion for a DUI investigation, the officer may investigate that offense by requesting the suspect perform SFSTs.

¶24 Here, the officers observed Schlichenmayer's demeanor; her bloodshot eyes; they smelled alcohol on her breath; Schlichenmayer herself said she had consumed alcohol; Andino's sister confirmed Schlichenmayer had been drinking; and Schlichenmayer was the driver of a vehicle at a crash scene. There were ample articulable facts giving the officers particularized suspicion to request SFSTs and breath tests. We affirm the District Court's denial of Schlichenmayer's Motion to Suppress Breath Test.

¶25 *Did the District Court err in concluding Schlichenmayer's statements to law enforcement were voluntary?*

¶26 Schlichenmayer argues her incriminating statements should be suppressed because the statements she made "were not taken lawfully, as they were made in violation of her right against self-incrimination." She asserts the officers allegedly continued to interrogate her while in custody without advising her of the *Miranda* rights.

¶27 The Fifth Amendment to the United States Constitution and Article II, Section 25 of the Montana Constitution protect individuals from making self-incriminating statements. *State v. Gittens*, 2008 MT 55, ¶ 12, 341 Mont. 450, 178 P.3d 91. These

---

SFSTs. Schlichenmayer and the State in the District Court, as part of the plea agreement, agreed that Schlichenmayer reserved for appeal "her motions to suppress and dismiss." Accordingly, we will address the merits of Schlichenmayer's motion.

constitutional safeguards ensure individuals that they not be compelled to be witnesses against themselves. *State v. Larson*, 2010 MT 236, ¶ 28, 358 Mont. 156, 243 P.3d 1130. When an individual "is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning," law enforcement must "adequately and effectively" apprise the person of their *Miranda* rights and "the exercise of those rights must be fully honored." *State v. Monisey*, 2009 MT 201, ¶ 28, 351 Mont. 144, 214 P.3d 708. Failure of law enforcement to provide the appropriate *Miranda* warnings prior to a "custodial interrogation" generally requires courts to suppress evidence of the statements made in violation thereof. *State v. Kelm*, 2013 MT 115, ¶ 29, 370 Mont. 61, 300 P.3d 687. To determine whether a "custodial interrogation" has occurred we look at "(1) whether the individual was 'in custody' and (2) whether the individual was subjected to an 'interrogation.'" *State v. Maile*, 2017 MT 154, ¶ 12, 388 Mont. 33, 396 P.3d 1270 (quoting *State v. Munson*, 2007 MT 222, ¶ 21, 339 Mont. 68, 169 P.3d 364).

¶28　　For the first prong, we look at the totality of the circumstances to determine "not whether a reasonable person would feel free to leave, but rather whether there was a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Maile*, ¶ 12. "[S]tatements made by a defendant in response to an officer's roadside questioning [do] not require warnings of constitutional rights because of the brevity of questioning and its public setting, even though few motorists would feel free to leave." *Larson*, ¶ 28. Law enforcement may ask a "moderate number of questions to determine the detainee's identity and to try to obtain information confirming or dispelling the officer's

suspicions before the requirements of *Miranda* attach." *Larson*, ¶ 32. The questioning may "ripen into a custodial interrogation if the circumstances of the detention and related questioning evolve to approximate the more coercive nature of an incommunicado police interrogation incident to a formal arrest." *City of Missoula v. Kroschel*, 2018 MT 142, ¶ 26, 391 Mont. 457, 419 P.3d 1208. There are not definite or "specific time parameters for roadside investigatory stops, because reasonableness is dependent upon specific circumstances." *Larson*, ¶ 31.

¶29 Under the second prong in *Maile*, the term "interrogation" means "express or implied questioning initiated by a law enforcement officer." *Kroschel*, ¶ 23. "The term broadly includes both express questioning and any words or actions on the part of police (other than those normally attendant to arrest [or] custody) that the police should know are reasonably likely to elicit an incriminating response." *Kroschel*, ¶ 23 (internal quotation marks omitted). The focus in determining whether an interrogation occurred is not on the intent of the police but, rather, "the perceptions of the suspect." *Kroschel*, ¶ 23.

¶30 "[A] request for field sobriety tests, without interrogation, does not subject a detainee to a custodial interrogation." *State v. Stanczak*, 2010 MT 106, ¶ 9, 356 Mont. 263, 232 P.3d 896. "Similarly, the Fifth Amendment offers no protection against compulsion to submit to a breath test because the results of a breath test are not self-incriminating communications, but instead are unprotected physical or real evidence." *Kelm*, ¶ 30 (internal quotation marks omitted). In *Kelm*, we reasoned "[t]he Fifth Amendment offers no protection against compulsion to assume a stance, to walk, or to make a particular

13

gesture." *Kelm*, ¶ 30. Therefore, an officer's request that a DUI suspect perform a series of sobriety tests, done without interrogating the suspect, does not constitute custodial interrogation. *Kelm*, ¶ 30.

¶31 In this case, Officer Capulong did not initiate a "custodial interrogation." Officer Capulong's initial encounters with Schlichenmayer were not "custodial." He asked a "moderate number of questions" to confirm or dispel his suspicions. The officers allowed her to walk roughly 30 feet away from them to speak and text on her phone. The record does not support Schlichenmayer's contention that she was in custody prior to being arrested.

¶32 Once arrested, the officers did not ask Schlichenmayer any questions or conduct interrogation in the patrol vehicle or at the detention center. Although Schlichenmayer made voluntary incriminating statements while being subjected to the SFSTs (e.g., "I already told you guys I drank three or four beers"), the statements were not prompted by law enforcement. Rather, she made the statements in response to Officer Capulong informing her he believed she was under the influence and in response to his request for a breath test. The record does not establish the officers conducted a custodial interrogation at any point. Further, the SFST and breath test results are not statements because they are physical evidence. *See Kelm*, ¶ 30. The District Court did not commit clear error when it found Schlichenmayer was not in custody until placed under arrest and, once arrested, the officers did not interrogate her while in custody. We affirm the District Court's denial of Schlichenmayer's Motion to Suppress Statements.

14

**CONCLUSION**

¶33   The District Court did not err when it denied Schlichenmayer's Motions to Suppress.  Law enforcement had particularized suspicion to investigate Schlichenmayer for DUI because Officer Capulong's observations provided specific and articulable facts that indicated Schlichenmayer was under the influence.  Officer Capulong's initial contact with Schlichenmayer was justified by the community caretaker doctrine, and her seizure was proper.  Further, the officers did not conduct an illegal search because there were ample articulable facts giving the officers particularized suspicion to request SFSTs and breath tests.  Lastly, the officers did not initiate a custodial interrogation, and once in custody, Schlichenmayer made voluntary incriminating statements.

¶34   Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ JIM RICE