

DA 10-0375, DA 10-0521, DA 10-0522, DA 10-0523, DA 10-0525, DA 10-0526

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2011 MT 274

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

DAMON FRANKLIN PETERS,

      Defendant and Appellant.

| | |
|---|---|
| APPEAL FROM: | District Court of the First Judicial District,<br>In and For the County of Lewis and Clark, Cause Nos. ADC 2009-06,<br>CDC 2009-149, BDC 2009-164, CDC 2009-148, ADC 2009-153, and<br>CDC 2009-250<br>Honorable Dorothy McCarter, Honorable Kathy Seeley, and Honorable<br>Jeffrey Sherlock, Presiding Judges |

COUNSEL OF RECORD:

      For Appellants:

          Wendy Holton, Attorney at Law, Helena, Montana

      For Appellee:

          Steve Bullock, Montana Attorney General; D. Ole Olson, Assistant Attorney
          General, Helena, Montana

          Melissa C. Broch and Mary Cochenour, Deputy County Attorneys, Helena,
          Montana

          David L. Nielsen, Helena City Attorney; Luke Berger, Deputy City Attorney,
          Helena, Montana

                         Submitted on Briefs:  August 24, 2011
                                Decided:  November 3, 2011

Filed:

                _____
                              Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1      In this case, we consider the consolidated appeals of Damon Franklin Peters (Peters), Matthew Boyd Banks, Kirk Buls, Connie Christofferson, Vicki Brandt Fitzgerald, and Jarrett Lee Super (collectively "Appellants"), for the purpose of resolving two issues common to each of their cases. Each Appellant sought the source code and information about the use of the Intoxilyzer 8000 in their respective DUI cases. The First Judicial District Court, Lewis and Clark County, limited the requests of each defendant. From those orders, each appeals. We affirm.

¶2      This case also involves an issue unique to Peters' case, which is discussed separately below. Peters appeals the denial of his motion to suppress by the First Judicial District Court, Lewis and Clark County. We affirm.

## BACKGROUND OF CONSOLIDATED APPEALS

¶3      Each Appellant was charged with DUI pursuant to § 61-8-401, MCA, or DUI per se pursuant to § 61-8-406, MCA, and each took a breath test on the Intoxilyzer 8000. The prosecution, either the City of Helena, Montana, or the State of Montana (collectively "State"), used the breath sample results generated by the Intoxilyzer 8000 as evidence of guilt in each case.

¶4      Each Appellant moved the District Court for an order requiring the State, as a condition precedent to introducing each Appellants' breath sample result, to produce the source code and all related information for the Intoxilyzer 8000 so that this information could be examined by a defense expert. The source code is the human readable format of the

2

software that controls the operation of the Intoxilyzer 8000. In other words, the source code tells the Intoxilyzer 8000 how to calculate the numerical result, such as 0.08. If the source code contains a mistake, then the result generated will be defective.

¶5 The State opposed the Appellants' motions, arguing it had no better access to the source code than Appellants, as the source code is possessed and controlled exclusively as intellectual property by CMI, Inc. (CMI), a Kentucky-based corporation.

¶6 The District Court issued a Certificate of Judge Requesting Out-of-State Witness, a summons, and a subpoena duces tecum (collectively "Certificate") to Toby Hall (Hall), President of CMI. The documents commanded Hall to appear in Montana to give testimony and to produce:

> 1. The Intoxilyzer 8000 source code (all versions in electronic and paper format);
> 2. The Intoxilyzer 8000 Basic Software program with adaptations and modifications (all versions in electronic and paper format);
> 3. The Intoxilyzer 8000 Montana Software program (all versions in electronic and paper format);
> 4. The Intoxilyzer 8000 R-Software program and/or its equivalent ever used, or created for use in Arizona (all versions in electronic and paper format);
> 5. The Intoxilyzer 8000 "Check-Sum" Program or its equivalent (all versions in electronic and paper format);
> 6. Any other applicable software programs used in the Intoxilyzer 8000 (all versions in electronic and paper format);
> 7. Information, documentation, and identification as to the software maker for the Intoxilyzer 8000, if outsourced from CMI.

¶7 In the Daviess Circuit Court, Division I, Commonwealth of Kentucky ("Kentucky Court"), Hall and CMI opposed the Certificate as being defective on its face. After a hearing in Kentucky, at which Appellants' attorney and expert witness, Thomas Workman (Workman), appeared, the Kentucky Court agreed with Hall and CMI. It found the

3

Certificate defective on its face. It also found "[t]he source code is a trade secret of CMI, Inc." and that it would be "an undue hardship for CMI to produce the source code."

¶8 However, Hall and CMI offered to produce the source code subject to certain conditions. The Kentucky Court's order stated:

> 4. … CMI is agreeable to electronic disclosure of the source code at CMI's offices in Owensboro, Kentucky. A Protective Order, as attached hereto, shall govern electronic disclosure of the source code at CMI's offices in Owensboro, Kentucky.
> 5. Mr. Hall is not required to take any further action, in response to the Montana "Certificate", until and unless the appropriate Protective Orders and Non-Disclosure Agreements attached hereto, have been signed by Montana defense counsel, his local counsel, and any proposed expert.
> 6. The Court further Orders that Items 2-7, of the subpoena duces tecum attached to the Montana "Certificate", are denied. When and if the Montana defendant is able to particularize, and narrow, the scope of the documents requested, local counsel may resubmit those items to CMI for further review. CMI shall be entitled to advance compensation, however, for time and expense for responding to any such future document requests.

The Kentucky Court retained jurisdiction for the purposes of its order and the attached Protective Order.

¶9 The Protective Order limits the use of "confidential" information, including the source code, to the "above-captioned matter," meaning the specific case in which the source code and "confidential" information was sought. Access to any "confidential" information was limited to:

> (a)     The Court and its staff;
> (b)     Attorneys of record and their law firms;
> (c)     Persons shown on the face of the document to have authored or received it;
> (d)     Court reporters retained to transcribe testimony;
> (e)     The Parties to this case;
> (f)     Outside vendors (limited to professional copy services); and

4

(g)     Outside independent persons who are retained by or otherwise assist a Party or its Attorney to provide technical or expert services and/or give testimony in this action, and who are not, and have not been, employed by (as an employee, agent, or consultant) or otherwise affiliated with, any manufacturer of breath alcohol testing instruments within the preceding twenty-four (24) months.

Under the Protective Order, "outside independent persons," attorneys, and the parties receiving access to "confidential" information and the source code are also required to execute a Non-Disclosure agreement, attached as Exhibit A to the Protective Order.

¶10     The Non-Disclosure Agreement provides, in relevant part:

I agree not to copy or replicate any part of the Source Code, except as necessary to perform a meaningful Source Code review.  I agree that I will not reproduce, use, or disclose any Confidential Information obtained through my inspection and review of the Source Code except in accordance with the Protective Order in the above-captioned case and this Non-Disclosure Agreement.

¶11     In exchange for executing the Protective Order and Non-Disclosure Agreement (collectively "Agreements"), CMI agreed to provide the following at its Owensboro, Kentucky, headquarters:

i.      All Source Code files for the current version of the Intoxilyzer used in the State of Montana in native electronic format, capable of review and analysis by commercial source code review software such as LINT or Understand.
ii.     All libraries and files used to assemble or compile and link the Source Code.
iii.    All make files and script files (as applicable only to the Intoxilyzer 5000) used to assemble or compile and link the Source Code.
iv.     The assembler and linker for the Z-80 processor and the compiler and linker for the 8051 processor as applicable only to the Intoxilyzer 5000.
v.      A computer capable of viewing and reviewing the Source Code.  CMI will also provide a printer for printing sections of material for ease of review on site, however, all printouts including or comprising any portion of the Source Code will be retained by CMI at the end of the evaluation.

vi.     Completely assembled or compiled and linked "HEX files" for both the Z-80 and 8051 systems, and EPROM's with the HEX files loaded for both the Z-80 and 8051 systems as applicable only to the Intoxilyzer 5000.
vii.    A printout of actual data obtained as a result of calibration.
viii.   A COBRA system as used by the State of Montana to download data from instruments and the cables required to link to a test instrument.
ix.     An Intoxilyzer, configured for the State of Montana, for testing, loaded with the EPROM's mentioned in item vi. CMI will also make available wet bath simulators and solution for instrument testing.

¶12    Additionally, as part of CMI producing the above information, CMI included the following terms:

> No part of the Source Code in its native electronic format shall be copied, transmitted, or removed from CMI's corporate headquarters in Kentucky. No portion of the Source Code shall be copied verbatim except as necessary for meaningful expert review. Any notes, summaries, reports, or other documents that contain a verbatim recitation of any portion of the Source Code shall not be publicly disclosed unless all verbatim recitations of the Source Code have been completely redacted, and if filed with a court of law, shall be filed under seal. If litigants, their counsel, or experts, load the Source Code onto their own computers for analysis with commercial programs such as LINT or Understand, or for any other purpose, such computers may not have communications capabilities, including wi-fi/wireless, Ethernet, or modem capability, or such capabilities must be completely disabled. Further, such computers must have any external drives, USB ports, and other data transfer capabilities disabled. If any portion of the Source Code is loaded onto a reviewer's computer, the reviewer must agree to destroy the computer's hard drive at CMI in the presence of CMI's representative, or to leave the computer's hard drive at CMI at the conclusion of the review.

¶13    The State filed the Agreements with the District Court, and suggested the Appellants be given a reasonable time to comply and view the source code before setting the cases for trial. After a "very lively discussion," in chambers and off the record, the District Court found that the requirement to sign the Agreements was reasonable. It then set a hearing on

6

whether it would be an undue hardship, under § 46-15-322, MCA, for Appellants to view the source code in Kentucky under CMI's proffered terms.

¶14 At the hearing, the only witness was Workman. Workman testified that, generally, he had no objection to signing a protective order. However, Workman testified to a "number of problems" with the Agreements. Workman felt the Agreements were "strictly limiting, and they threaten my license to practice law if I violate them." He said, regarding the non-disclosure agreement, "it's not that I won't sign it. I don't believe I can sign it - - without subjecting myself to sanctions." Workman also felt the Agreements were unreasonable because it would take 90 days to review the source code at CMI headquarters - "[i]t is cost prohibitive to do that and it would take significantly longer to do it in Kentucky." Workman also took issue with having to destroy his computer hard drive when leaving CMI headquarters. Workman wanted the source code sent electronically to him, so it could be reviewed on his computer, without having to sign the Agreements.

¶15 Workman agreed that CMI was offering "all the things [he] request[ed] in its native environment[,]" including the source code, a computer and software to analyze the source code, a fully operational Intoxilyzer configured for the State of Montana, and solution for testing. Essentially, CMI would provide everything Workman would need to review the source code in its native format, and the actual Intoxilyzer itself. Workman also testified that he would not personally be conducting the review of the source code, but "would hire individuals to do the actual review" while he would "manage the source code review."

¶16 At the conclusion of the hearing, the District Court stated:

7

I'm ruling that there's reasonable accessibility through signing the [Agreements]. I think that's reasonable. The issue of whether or not that would be considered protected information under Montana law is not before us now. That's not appropriate for me to have separate hearings on that . . . It's my feeling that if the State of Kentucky heard all of that information and heard all of that evidence and had a hearing, that that's appropriate and that we would give the State of Kentucky full faith and credit on that determination. And so, because it's a – it's protected information, the nondisclosure provision is reasonable. The evidence today indicates that access to the source code and to all of that other software and hardware that's pertinent to evaluating the effectiveness and the – and whether or not the source code is in error or whether it's not in error, that's all available in the State of Kentucky. And it sounds to me like the State of Kentucky is doing whatever they can that's reasonable and appropriate to provide the information that people need, that the defense needs, within the scope of their protection of their trademark or intellectual property.

¶17 Appellants also issued a subpoena duces tecum to Benjamin Vetter of the Montana Department of Justice, Forensic Sciences Division, seeking virtually all information related to the use of the Intoxilyzer 8000 in Montana. The subpoena duces tecum sought information "for all Intoxilyzer 8000 machines deployed in Montana from their date of deployment to today's date [March 16, 2010]" including: operating, training, and maintenance manuals; the State's procurement contracts; "all information relating to breath testing of citizens, whether the test produced an evidentiary result or not;" inspection, calibration, and certification information; "Login" information; and the machine code.[1] The State moved to quash the subpoena, arguing it circumvented the discovery statutes and that it lacked a statement of substantial need and undue hardship, as required by § 46-15-322, MCA.

¶18 After briefing, the District Court issued the following order:

8

Ben Vetter shall provide the following, if he has access to it:

1.    A copy of any documentation indicating that the Department of Justice has approved the Intoxilyzer 8000 used in this case and that there has been compliance with the requirement that personnel are properly trained.

2.    A copy of the operating, training and maintenance manuals for the Intoxilyzer 8000 used in this case.

3.    The State's procurement contract for the Intoxilyzer 8000 used in [this] case.

4.    Information relating to annual or monthly inspections of the Intoxilyzer 8000 used in this case for the year 2008.

All the rest of the information requested by [Appellants] is so voluminous and oppressive for this subpoena. [Appellants have] failed to establish substantial need to overcome the burden [they] want[] to impose and, furthermore, the Court questions the relevance of this information in view of the pending criminal charge.

¶19    Shortly after this ruling, each Appellant entered a plea of guilty, reserving their right to appeal. Appellants appeal from both orders of the District Court limiting their requests. We consolidated the appeals for the purpose of deciding the following issues:

¶20    *Issue One*: *Whether the District Court erred when it denied the Motion for Discovery Of, Issuance of Subpoena Duces Tecum For, or Order Directing the City to Issue an Investigative Subpoena For, the Source Code for the Intoxilyzer 8000?*

¶21    *Issue Two*: *Whether the District Court erred when it quashed portions of the defendants' Subpoena Duces Tecum directed to Benjamin Vetter of the Montana Department of Justice, Forensic Science Division?*

**STANDARD OF REVIEW**

¶22    We review orders granting or denying requests for discovery for an abuse of discretion. *City of Billings v. Peterson*, 2004 MT 232, ¶ 13, 322 Mont. 444, 97 P.3d 532

---

[1] This is not an exhaustive list. Indeed, the subpoena contains 5 pages of requests.

(citing *State v. DuBray*, 2003 MT 255, ¶ 103, 317 Mont. 377, 77 P.3d 247).  An abuse of discretion occurs when the district court acts arbitrarily without employing conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice.  *State v. Knowles*, 2010 MT 186, ¶ 22, 357 Mont. 272, 239 P.3d 129.

## DISCUSSION

¶23    *Issue One*: *Whether the District Court erred when it denied the Motion for Discovery Of, Issuance of Subpoena Duces Tecum For, or Order Directing the City to Issue an Investigative Subpoena For, the Source Code for the Intoxilyzer 8000?*

¶24    Appellants argue first that whether the source code is a trade secret should be decided here in Montana, not in Kentucky.  Second, they argue that disclosure of the source code is required under § 46-15-322, MCA, and that non-disclosure violates due process and the confrontation clause.  Finally, they seek a hearing on the reliability of the Intoxilyzer 8000.

¶25    The State argues, essentially, that Appellants already have access to all the information they seek - all Appellants must do is sign the Agreements.

¶26    We first address Appellants' argument that whether the source code is a trade secret of CMI should be decided under Montana law.  We conclude it should not.

¶27    The United States Constitution provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."  U.S. Const. art. IV, § 1; *Carr v. Bett*, 1998 MT 266, ¶ 38, 291 Mont. 326, 970 P.2d 1017.  Full faith and credit generally requires, at minimum, that each state give the judgments of its

10

sister states the res judicata effect which would be accorded in the state that rendered the judgment. *Durfee v. Duke*, 375 U.S. 106, 109 (1963); *Carr*, ¶ 39.

¶28    After a hearing in Kentucky, at which Appellants' attorney and Workman were present, the Kentucky Court found the source code to be a trade secret of CMI.   Further, the Kentucky Court found it would be an undue hardship on CMI to produce the source code. An appeal was filed, but ultimately dismissed as moot by the Kentucky Court of Appeals after the defendant pled guilty in Montana.  We find nothing in the record to disturb the Kentucky Court's findings.  We give full faith and credit to those determinations, and will not relitigate them in Montana.  *Carr*, ¶ 39.

¶29    Next, we turn to whether the disclosure of the source code is required under § 46-15-322, MCA, and whether non-disclosure violates due process and the confrontation clause.

¶30    Section 46-15-322(4), MCA, limits what the prosecution must disclose to "material and information in the possession or control of members of the prosecutor's staff and of any other persons who have participated in the investigation or evaluation of the case."  Section 46-15-322(5), MCA, provides, in relevant part:

> Upon motion showing that the defendant has substantial need in the preparation of the case for additional material or information not otherwise provided for and that the defendant is unable, without undue hardship, to obtain the substantial equivalent by other means, the court, in its discretion, may order any person to make it available to the defendant. The court may, upon the request of any person affected by the order, vacate or modify the order if compliance would be unreasonable or oppressive.

¶31    It is undisputed that the State does not possess the source code.  To argue that CMI participated in the investigation or evaluation of the case because they manufactured the

11

Intoxilyzer 8000 is unpersuasive. Appellants' arguments regarding § 46-15-322(4), MCA, are not well taken.

¶32 The District Court found that the Appellants did not show undue hardship under § 46-15-322(5), MCA, because the Agreements were reasonable and Workman's objections did not suffice to establish undue hardship, and because CMI agreed to provide access to the source code. We agree. Appellants desire unrestricted access to the source code. However, Workman admits CMI's offer to produce the source code includes all he would need to analyze the source code. While there may be some hardship visited upon Appellants, it is not undue. The source code was determined to be a trade secret of CMI by the Kentucky Court, and unrestricted access to that trade secret, as sought by Appellants, is unreasonable. We conclude CMI's offer and the Agreements are reasonable. Nothing in the record indicates the District Court abused its discretion.

¶33 Regarding Appellants' due process and confrontation clause arguments, we decline to address these constitutional issues. *Kulstad v. Maniaci*, 2010 MT 248, ¶ 49, 358 Mont. 230, 244 P.3d 722 ("Courts should avoid constitutional questions whenever possible."). While there may be a case in the future where these arguments should be more closely examined, this is not the case. The essential fact Appellants ignore is that CMI has offered to make the source code available to them and their expert. Their entire argument on these issues is based upon the notion that somehow the State or CMI is refusing to provide the source code. That is incorrect. Appellants simply do not like CMI's offer. The District Court, after the hearing, found the Agreements were reasonable, and that Workman's objections did not

establish an undue hardship under § 46-15-322(5), MCA. Again, we conclude the District Court did not abuse its discretion.

¶34 We similarly decline to order a hearing on the reliability of the Intoxilyzer 8000. Appellants request this hearing *after* they have reviewed the source code. However, Appellants' review of the source code could show the source code, and thus the Intoxilyzer 8000, is not flawed. Ordering a hearing at this point speculates that the Intoxilyzer 8000 is, in some unknown respect, inaccurate, and is premature. *See Montana Power Co. v. Montana Public Service Commission*, 2001 MT 102, ¶ 32, 305 Mont. 260, 26 P.3d 91 ("a court will not act when the legal issue raised is only hypothetical or the existence of a controversy merely speculative").

¶35 *Issue Two: Whether the District Court erred when it quashed portions of the defendants' Subpoena Duces Tecum directed to Benjamin Vetter of the Montana Department of Justice, Forensic Science Division?*

¶36 Appellants argue that all the information they sought in their subpoena duces tecum was relevant to whether the Intoxilyzer 8000 works properly, and as public information, it should all have been made available.

¶37 The State argues the request was unreasonable and oppressive, and the District Court was well within its discretion in limiting the scope of the subpoena duces tecum. Further, the State argues that Appellants did not follow the proper procedure for procuring public documents.

¶38 Section 46-15-106, MCA, provides:

13

(1)  A subpoena may command the person to whom it is directed to produce the books, papers, documents, or other objects designated in the subpoena.
(2)  The court may direct that the books, papers, documents, or other objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered into evidence and may upon their production permit the books, papers, documents, or objects, or portions thereof, to be inspected by the parties and their attorneys.
(3)  The court, upon a timely motion, may quash or modify a subpoena if compliance would be unreasonable or oppressive.

¶39    Section 46-15-322(5), MCA, provides, in relevant part:

Upon motion showing that the defendant has substantial need in the preparation of the case for additional material or information not otherwise provided for and that the defendant is unable, without undue hardship, to obtain the substantial equivalent by other means, the court, in its discretion, may order any person to make it available to the defendant. The court may, upon the request of any person affected by the order, vacate or modify the order if compliance would be unreasonable or oppressive.

¶40    Whether Appellants' request is viewed under § 46-15-106, MCA (which governs subpoenas), or § 46-15-322(5), MCA (which governs discovery), we agree with the District Court that the request is unreasonable and oppressive.[2]  Appellants sought virtually all information regarding the use of every Intoxilyzer 8000 in the State of Montana, from the day it was purchased to the date of the subpoena duces tecum, whether related to their individual cases or not. The District Court concluded that the information requested was unreasonably voluminous.  Accordingly, the District Court narrowed the scope of information that the State was required to produce.

¶41    The District Court ordered the State to produce:

---

[2] While not briefed on appeal, the District Court also concluded the subpoena duces tecum was void because § 46-15-106, MCA, allows only the district court to issue subpoenas duces tecum in criminal cases.  Indeed, the First Judicial District Court has a standing order to that effect.  *In re Subpoena Duces Tecum in Criminal Cases*, 2010 Mont. Dist. LEXIS 383 (April 24, 2010).  Because this was not briefed, we make no ruling on the issue.

1. A copy of any documentation indicating that the Department of Justice has approved the Intoxilyzer 8000 used in this case and that there has been compliance with the requirement that personnel are properly trained.
2. A copy of the operating, training and maintenance manuals for the Intoxilyzer 8000 used in this case.
3. The State's procurement contract for the Intoxilyzer 8000 used in [this] case.
4. Information relating to annual or monthly inspections of the Intoxilyzer 8000 used in this case for the year 2008.

¶42 We conclude the District Court did not abuse its discretion when it limited the scope of information to be provided by the State. The District Court's order was reasonably calculated to produce information relevant to Appellants' cases.

¶43 Finally, Appellants' argument that the information they seek is a matter of public record is unavailing. Appellants did not file a request for public documents under Article II, Section 9 of the Montana Constitution, or its corresponding statutes. Instead, Appellants issued a subpoena duces tecum for the information they sought at the end of a long discovery battle. Indeed, Appellants only alleged the "right to know" after the State sought to quash the subpoena duces tecum.

¶44 The right to know is not absolute, and there is a specific process used to obtain documents while also protecting individual privacy. *Yellowstone County v. Billings Gazette*, 2006 MT 218, ¶¶ 18-20, 333 Mont. 390, 143 P.3d 135. Here, this issue was simply not fully and fairly presented to the District Court, and we decline to address it.

## CONCLUSION

¶45 The Appellants failed to show that the District Court acted arbitrarily or exceeded the bounds of reason on either issue. Appellants have access to the source code. Appellants'

15

subpoena duces tecum was unreasonable and oppressive. We affirm the District Court in all respects on the two issues above.

## FACTS SPECIFIC TO PETERS

¶46 On November 17, 2008, at approximately 12:30 p.m., a concerned citizen, Sandra, reported a possible drunk driver leaving the parking lot of Capital Sports in Helena. Sandra described the suspect's vehicle as a Suburban and provided the license plate number. Helena Police Officer Lynette Flink ("Flink") responded, and tried to locate the vehicle at Capital Sports. Flink was unable to locate the vehicle, so she drove to the registered owner's address.

¶47 When Flink arrived at the address, she saw a Suburban matching Sandra's description in the driveway. Two doors on the driver's side were open, there was a male in the passenger seat, and a male was walking away from the vehicle towards the house. Flink verified the license plate number. Flink then made contact with the passenger, asking where the driver of the vehicle was. The passenger eventually responded that the driver was in the house. The passenger then tried to get out of the vehicle, and Flink ordered the passenger to stay in the vehicle. The passenger initially refused, but a second officer approached and the passenger complied.

¶48 Flink, alone, then approached the back door of the home, which was open. Inside, she could see a male she believed to be Damon Peters, whom she recognized from past associations, talking on the phone. His identity was later confirmed. She knocked on the door, but did not enter the house. Peters approached her with arrows in his hand. She asked

16

him to put the arrows down, which Peters did. Flink told Peters she needed to speak with him. Peters came outside and Flink asked him if he was driving the Suburban. Peters did not admit to driving. Peters did admit that the house and Suburban were his, that he had been drinking earlier in the day, and that he had just returned from Capital Sports.

¶49 Flink then asked Peters to get his insurance information. Peters walked to the Suburban and retrieved his insurance information from the vehicle. Once Peters retrieved his insurance information, Flink asked Peters to come with her to the back of the Suburban. There, she asked Peters if he just got back from hunting. Peters responded about two other individuals. Flink asked if the other individuals were with him. Peters said "we just pulled everyone out of the woods yesterday." Flink then asked Peters if he had "been drinking all day?" Peters responded that he "had a couple drinks, yeah." Flink then asked him to "hang tight."

¶50 Flink returned to her patrol car and attempted to contact Sandra. At this time, a third officer arrived and joined the second officer near the Suburban. After several failed attempts, Flink finally reached Sandra via telephone. Flink asked Sandra if she saw who was driving the Suburban. Sandra responded that the passenger had on a gray wool coat, and the driver was wearing jeans. Flink asked if Sandra remembered what the driver was wearing. Sandra said the driver had on jeans, no jacket, but she could not recall what type of shirt he was wearing. Sandra also said he was wearing hiking-type shoes, had short hair and she did not think he had facial hair. Sandra said she thought she could recognize the driver again if

17

she saw him. Flink then asked Sandra to come to the scene to identify the driver. Although reluctant, Sandra agreed to drive to Peters' residence to identify the driver.

¶51 However, before Sandra arrived, Flink consulted with another officer. Flink stated that Sandra gave a "decent" description of Peters, although the description did not include facial hair (which Peters indeed had), but that Peters also admitted to being at Capital Sports. After this discussion, she asked Peters to come speak with her. She then told Peters "I believe you're the driver of this vehicle and I have a witness who is telling me the same thing." "She gave a pretty good description of you. She is going to come down here and see if you're the same guy that she saw, but I'll be honest with you Damon, you pretty much match the description she gave me." Flink then asked Peters "were you driving?" Peters said "yes."

¶52 Flink then proceeded to investigate Peters for DUI. Peters showed obvious signs of impairment, and refused a breath test outside his home. Peters was then arrested and taken to the Lewis and Clark County Detention Center. There, Peters agreed to take a breath test on the Intoxilyzer 8000. Peters' breath test result was 0.173. Officers at the detention center also found several small, blue pills on Peters' person.

¶53 Peters was charged with DUI, a misdemeanor, in violation of § 61-8-401, MCA, and possession of dangerous drugs, a felony, in violation of § 45-9-102, MCA. Peters filed a motion to suppress "all evidence obtained as a result of an illegal interrogation." An evidentiary hearing was held on June 25, 2009. On August 31, 2009, the District Court denied Peters' motion to suppress, finding that the initial investigatory stop was valid and

18

that Peters was not in custody until his formal arrest, thus a *Miranda* warning was not required.

## STANDARD OF REVIEW

¶54 We review the denial of a motion to suppress to determine whether the district court's findings of fact were clearly erroneous and whether it correctly applied the law to those findings. *State v. Wilkins*, 2009 MT 99, ¶ 4, 350 Mont. 96, 205 P.3d 795.

## DISCUSSION

¶55 Peters argues he was arrested when Flink told him she needed to speak with him, and the arrest was illegal because it occurred without a warrant in his home. Further, Peters argues because he was in custody, he should have been given a *Miranda* warning. Because of his "illegal" arrest and questioning, Peters argues all evidence obtained as a result must be suppressed.

¶56 The State argues that the only difference between this case and a "typical public, routine, and temporary traffic stop" is the fact that it occurred at, but not inside, Peters' home. The State argues Peters was not seized or placed into custody until after he admitted to driving and the officer determined he was impaired by alcohol.

¶57 "In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is

19

observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense. . . ." Section 46-5-401(1), MCA.

¶58 To establish particularized suspicion, the officer must have (1) objective data and articulable facts from which the officer can make certain reasonable inferences; and (2) a resulting suspicion that the person to be stopped has committed, is committing, or is about to commit an offense. *Brown v. State*, 2009 MT 64, ¶ 20, 349 Mont. 408, 203 P.3d 842. Whether particularized suspicion exists is determined by examining the totality of the circumstances. *Brown*, ¶ 22. In evaluating the totality of the circumstances, a court should consider the quantity (content) and quality (degree of reliability) of the information available to the officer. *State v. Pratt*, 286 Mont. 156, 161, 951 P.2d 37, 40 (1997).

¶59 Officers may rely on information from citizen informants in forming particularized suspicion. *Pratt*, 286 Mont. at 162, 951 P.2d at 41. An informant's report can be viewed as reliable when (1) the citizen informant identifies herself to law enforcement, thus exposing herself to liability if the report is false, (2) the report is based upon the citizen informant's personal observations, and (3) the officer's own observations corroborate the informant's information. *Pratt*, 286 Mont. at 165, 951 P.2d at 42-43. If an officer has a "tip from a reliable informant which includes a complete vehicle description, then the officer has a particularized reason to question a suspect." *State v. Ellinger*, 223 Mont. 349, 352, 725 P.2d 1201, 1203 (1986).

¶60 The circumstances in the present case indicate that Flink had the requisite particularized suspicion to conduct a valid investigatory stop at Peters' home. An identified citizen, Sandra, reported a possible drunk driver. Sandra also supplied her contact information to law enforcement. Sandra witnessed the information she reported personally. That information included a description of the vehicle and the license plate number. This information was corroborated by Flink when she arrived at Peters' home. Flink saw a man sitting in the passenger seat, and another man walking away from the Suburban to the home. No other individuals were near the Suburban. The passenger told Flink the driver was in the home. Based upon these facts, Flink made the reasonable inference that the man walking toward the home was the driver of the Suburban. The resulting suspicion was that the driver committed DUI. The totality of the information witnessed by Sandra and corroborated by Flink formed a sufficient basis for particularized suspicion. We conclude Flink's investigatory stop was valid. Section 46-5-401(1), MCA.

¶61 Peters was not in custody during the investigatory stop, therefore no *Miranda* warning was required. A *Miranda* warning is only required during a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Ellinger*, 223 Mont. at 355, 725 P.2d at 1204. A person is "in custody" for the purposes of *Miranda* when "they have been deprived of their freedom of action in any significant way or their freedom of action has been curtailed to a degree associated with formal arrest." *State v. Lacey*, 2009 MT 62, ¶ 59, 349 Mont. 371, 204 P.3d 1192. Routine, public, and temporary investigatory stops, to confirm or dispel suspicions, are not generally custodial interrogations. *See State v. Allen*, 1998 MT 293,

21

¶¶ 11, 13, 292 Mont. 1, 970 P.2d 81 (temporary detention to investigate a motorist for DUI not a custodial interrogation).

¶62   As stated above, Peters was approached pursuant to a valid investigatory stop. Peters was not commanded by Flink to exit his home, but did so voluntarily. Simply because Peters came out of his home to speak with Flink does not mean Peters was in custody at that time. As in *Ellinger*, Peters stepped outside his home and, when questioned, admitted drinking and driving, and after these admission was arrested. *Ellinger*, 223 Mont. at 352, 355, 725 P.2d at 1203. We conclude Peters was not in custody during the investigatory stop. *Ellinger*, 223 Mont. at 355, 725 P.2d at 1204-05. Therefore, no *Miranda* warning was required. *Ellinger*, 223 Mont. at 355, 725 P.2d at 1204.

## CONCLUSION

¶63   For the reasons stated above, we affirm the denial of Peters' motion to suppress. The District Court's findings of fact were not clearly erroneous and it correctly applied the law to those findings.

¶64   Affirmed.

/S/ MICHAEL E WHEAT

We Concur:

/S/ MIKE McGRATH
/S/ BRIAN MORRIS
/S/ BETH BAKER
/S/ JIM RICE

22