JUSTICE WHEAT
delivered the Opinion of the Court.
¶1 Chad Larsen Made (Made) appeals from the June 8, 2015 order of the Thirteenth Judicial District Court, Yellowstone County, denying his motion to reverse and remand the Justice Court’s denial of his motion to suppress evidence obtained during the interrogation of him by Montana Fish, Wildlife, and Park (FWP) game wardens at a game check station. We affirm.
¶2 We address the following issues on appeal:
1. Did the District Court err in affirming the Justice Court’s determination that Made was not subject to custodial interrogation at the FWP game check station and thus was not entitled to Miranda warnings prior to questioning by the game wardens?
2. Did the District Court err in affirming the Justice Court’s determination that the admissions Made made were voluntary?
FACTUAL AND PROCEDURAL BACKGROUND
¶3 On November 17, 2013, Made and Paul Olson (Olson) stopped at a FWP game check station just outside of Columbus, Montana, with a mule deer harvested by Made in the bed of the pickup truck. FWP game wardens inspected the deer at the check station and contacted Made after observing that the license attached to the deer had been issued to a female hunter. The wardens asked Made about the deer and he began to answer questions and converse with the wardens. He eventually made numerous admissions over the course of the questioning. The investigation was recorded by the Outdoor Channel “Wardens” reality television show, which was on scene and filming the questioning of Olson and Made.
¶4 During the course of the wardens’ investigation, Made admitted that he shot the mule deer and placed his daughter’s tag on the animal. He also told the wardens that he had illegally shot two additional deer *35 using his fiancé’s tags in Yellowstone County, Montana. He informed the wardens that one deer was currently being processed at a commercial butcher in Billings, Montana. The wardens subsequently went to Maile’s home and he consented to a search of his freezer. The wardens located and confiscated the deer meat that they determined had been illegally harvested.
¶5 Made was subsequently charged with License, Permit or Tag Offense in violation of § 87-6-304(5), MCA; Unlawful Possession, Transfer, or Transport of Game Animal in violation of § 87-6-202(1), MCA; and Hunting or Killing a Game Animal Over the Legal Limit in violation of § 87-6-413(1), MCA. Made moved to suppress evidence gathered at the FWP check station, arguing that the incriminating statements Made made were fruits of an illegal interrogation. On July 16, 2014, the Justice Court conducted a suppression hearing and, on July 25, 2014, the court denied Maile’s motion, concluding that Made was not subject to custodial interrogation at the check station and thus was not required to receive Miranda warnings.[1] On August 15, 2014, the Justice Court held a non-jury trial and, on August 28, 2014, the court found Made guilty on all three counts of the indictment.
¶6 Made appealed to the Thirteenth Judicial District Court, contending that he was subjected to a custodial interrogation without first being given Miranda warnings, and that the admissions he made were not given voluntarily and thus should be suppressed. The District Court affirmed the Justice Court on the same grounds given by the lower court. Made filed a timely appeal with this Court. Additional facts will be provided as necessary to address the issues raised.
STANDARD OF REVIEW
¶7 Upon Maile’s appeal from the Justice Court, the District Court functioned effectively as an intermediate appellate court. See §§ 3-5-303, 3-10-115, MCA. We review cases that originate injustice courts of record and are appealed to a district court as if the appeal originally had been filed in this Court. Accordingly, we undertake an independent examination of the record apart from the district court’s decision. State v. Kebble, 2015 MT 195, ¶ 14, 380 Mont. 69, 353 P.3d 1175; State v. Lamarr, 2014 MT 222, ¶ 9, 376 Mont. 232, 332 P.3d 258.
¶8 The Montana Supreme Court reviews a trial court’s determination that a defendant was not entitled to Miranda warnings for correctness. State v. Elison, 2000 MT 288, ¶¶ 12, 34, 302 Mont. 228, 14 P.3d 456. We review a trial court’s findings of fact on a motion to suppress an *36 admission or a confession to determine whether the findings are clearly erroneous. State v. Loh, 275 Mont. 460, 475, 914 P.2d 592, 601 (1996). A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if this Court has a definite or firm conviction that the trial court committed a mistake. Loh, 275 Mont. at 475, 914 P.2d at 601. Substantial evidence requires more than a mere scintilla of evidence, but may be less than a preponderance of the evidence. State v. Scarborough, 2000 MT 301, ¶ 30, 302 Mont. 350, 14 P.3d 1202. The voluntariness of a confession or admission is a factual question which must take into account the totality of the circumstances. Loh, 275 Mont. at 475, 914 P.2d at 601.
DISCUSSION
¶9 1. Did the District Court err in affirming the Justice Court’s determination that Made was not subject to custodial interrogation at the FWP game check station and thus was not entitled to Miranda warnings prior to questioning by the game wardens?
¶10 Made argues that the FWP wardens violated his right against self-incrimination guaranteed by the Montana and United States Constitutions when they interrogated him without first issuing him Miranda warnings. The Justice Court concluded that no constitutional violation occurred because Made was not in custody for purposes of Miranda.
¶11 The Fifth Amendment to the United States Constitution and Article II, Section 25 of the Montana Constitution provide that no person shall be compelled, in any criminal case, to be a witness against himself. The United States Supreme Court addressed this privilege against self-incrimination in Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966), holding that “the prosecution may not use statements that stem from a custodial interrogation of a defendant unless the defendant is warned, prior to questioning, that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney.” State v. Olson, 2003 MT 61, ¶ 13, 314 Mont. 402, 66 P.3d 297 (citing Miranda, 384 U.S. at 444, 86 S. Ct. at 1612). Thus, an individual must be apprised of his Miranda rights when the individual is “taken into custody or otherwise deprived of his freedom of action in any significant way” and is subjected to questioning. Olson, ¶ 18 (quoting State v. Belgarde, 1998 MT 152, ¶ 26, 289 Mont. 287, 962 P.2d 571). “[F]ailure to give the prescribed warnings and obtain a waiver of *37 rights before custodial questioning generally requires exclusion of any statements obtained.” Missouri v. Seibert, 542 U.S. 600, 608, 124 S. Ct. 2601, 2608 (2004).
¶12 Whether a “custodial interrogation” has occurred which requires law enforcement officers to issue Miranda warnings before questioning can begin involves a two-step inquiry: “(1) whether the individual was ‘in custody’ and (2) whether the individual was subjected to an ‘interrogation.’ ” State v. Munson, 2007 MT 222, ¶ 21, 339 Mont. 68, 169 P.3d 364. The State does not dispute that Made was subject to an “interrogation” in this case. Thus, we need only determine whether Made was “in custody” at the check station at the time of the interrogation. In this regard, the United States Supreme Court has articulated “ ‘[t]wo discrete inquiries’ that are essential to the ‘in custody’ determination”:
first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players’ lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: [was] there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.
Munson, ¶ 22 (quoting Thompson v. Keohane, 516 U.S. 99, 112, 116 S. Ct. 457, 465 (1995)). This Court has explained the variety of circumstances pertinent to the first inquiry, including:
the language used by the officers; the location or physical surroundings where the questioning occurs; whether the individual consented to speak with the officers; the degree of pressure applied to detain the individual; whether the individual was moved to another area; whether the officers informed the individual that he or she was not under arrest and was free to leave or could ask the officers to leave; whether there was a threatening presence of several officers; whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical force; the duration of the detention; and the extent to which the individual was confronted with evidence of guilt.
Munson, ¶ 23. The foregoing circumstances are not dispositive and “must be considered together in determining whether ‘a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.’ ” Munson, ¶ 24 (quoting Thompson, 516 U.S. at 112, 116 S. Ct. at 465). Additionally, “we note that while *38 consideration of these factors might be useful, the ultimate inquiry is not whether a reasonable person would feel free to leave, but rather whether there was a ‘formal arrest or restraint on freedom of movement’ of the degree associated with a formal arrest.” Elison, ¶ 28 (quoting Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 1529 (1994)).
¶13 In State v. Dawson, 1999 MT 171, 295 Mont. 212, 983 P.2d 916, we held that Miranda warnings were not required where a defendant was questioned in his hotel room because although the “mood in the room was tense because of the officer’s suspicions,” the questioning only took a few minutes, there were other people in the room during the questioning and a brief protective frisk, and he was not placed under arrest or in handcuffs. Dawson, ¶¶ 34, 36. We explained that when an investigative stop is routine and the detention is brief, it does not fall within the ambit of a custodial interrogation requiring Miranda warnings:
This Court has previously held that law enforcement officers need not administer Miranda warnings to suspects during brief investigative encounters even if those encounters are somewhat coercive. Moreover, we have stated that an interrogation is not custodial unless there is a significant restriction of personal liberty similar to an arrest... and even temporary confinement as a safety precaution does not render the detention “custodial” for Miranda purposes ....
Dawson, ¶¶ 34-35 (citations omitted).
¶14 Likewise, in State v. Elison, 2000 MT 288, 302 Mont. 228, 14 P.3d 456, we found no custodial interrogation where a police officer: 1) stopped a vehicle upon hearing a report that the defendant had been observed smoking a marijuana pipe; 2) asked the defendant a moderate number of questions in a public setting and in the presence of another officer to determine the defendant’s identity and to obtain information confirming or dispelling the officer’s suspicion that he had been smoking marijuana; 3) requested that the defendant exit his vehicle and frisked him; and 4) informed the defendant that he was not free to leave during the questioning. In doing so, we explained, and reiterated our approval of, the United States Supreme Court’s holding in Berkemer v. McCarty, 468 U.S. 420, 104 S. Ct. 3138 (1984):
In Berkemer, the Supreme Court considered whether roadside questioning of a motorist detained pursuant to a traffic stop should be considered custodial interrogation for purposes of Miranda. The Court acknowledged that a traffic stop *39 “significantly curtails the ‘freedom of action’ of the driver and passengers, if any, of the detained vehicle.” The Court also noted that under the law of most States it is a crime to leave a traffic stop without permission and “few motorists would feel free to ... leave the scene of a traffic stop without being told they might do so.” However, these factual observations did not end the Court’s inquiry into whether the defendant was subjected to custodial interrogation. Instead, the Court focused on whether the defendant had demonstrated that the officer’s conduct before eliciting the incriminating statement was “comparable to those [restraints] associated with formal arrest.” In this regard, the Supreme Court observed that “the usual traffic stop is more analogous to a so-called ‘Terry stop,’ ... than to a formal arrest.” The Court decided that statements made by a defendant in response to an officer’s roadside questioning did not require warnings of constitutional rights because of the brevity of questioning and its public setting, even though few motorists would feel free to leave. We have repeatedly cited Berkemer with approval.
Elison, ¶ 29 (quoting Berkemer, 468 U.S. at 436-39, 441, 104 S. Ct. at. 3148-51) (citing Billings v. Skurdal, 224 Mont. 84, 89, 730 P.2d 371, 374 (1986)).
¶15 Applying these principles to the facts of this case, we now consider whether Made was “in custody” when the game wardens interrogated him at the game check station. We first note that a FWP check station, where hunters are required to “stop and report,” is closely akin to a traffic stop which is, in turn, “more analogous to a so-called Terry stop, than to a formal arrest.” Berkemer, 468 U.S. at 439, 104 S. Ct. at 3150 (citing Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968)). Like the roadside questioning of a motorist detained pursuant to a traffic stop, the roadside questioning of a hunter at a game check station detains a vehicle and curtails a driver and passenger’s freedom of action because it is unlikely that a hunter would feel free to leave a game check station without the permission of a game warden. However, as explained in Berkemer, this does not end the inquiry as to whether a custodial interrogation has occurred; rather, we must determine whether the wardens’ conduct before eliciting the incriminating statement is comparable to the restraints of a formal arrest. In this vein, we have held that “|r loutine, public, and temporary investigatory stops, to confirm or dispel suspicions, are not generally custodial interrogations.” State v. Peters, 2011 MT 274, ¶ 61, 362 Mont. 389, 264 P.3d 1124.
*40 ¶16 To be clear, we are not disturbing our prior holding in State v. Boyer, 2002 MT 33, 308 Mont. 276, 42 P.3d 771, that the governmental interest in the enforcement of Montana’s wildlife laws and our constitutional right to a clean and healthful environment is sufficiently substantial to justify the minimal intrusion upon the rights of those stopped for brief questioning and a visual inspection of their vehicle and harvest therein. Indeed, Boyer is inapplicable to the case at bar. The Berkemer decision did not reconsider whether a Fourth Amendment seizure, requiring a particularized suspicion justification, occurred in that case. Instead, Berkemer, as explained in Elison, simply invoked the circumstances surrounding a Terry stop for analogical purposes in the Fifth Amendment context. As such, in this case, and contrary to the assertion in the Special Concurrence, we are not blending “F ourth Amendment jurisprudence and F ifth Amendment jurisprudence.” Rather, we are considering whether the brief, public “stop and report” in this case, which is akin to a brief, public Terry stop that the Supreme Court considered in Berkemer, is nevertheless custodial because the other circumstances surrounding the interrogation rose to the level of a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.
¶17 Here, the game wardens did not place Made under arrest or in handcuffs. Accordingly, no formal arrest occurred prior to questioning. We also conclude that the circumstances surrounding the wardens’ questioning cannot be fairly characterized as the functional equivalent of a formal arrest when viewed from the perspective of a reasonable person in Maile’s situation. While the game wardens did ask Made to step away from Olson’s truck for questioning, they did not conduct a pat down frisk of Made, nor did they require Made to remove the knife or firearm on his person, even when Made volunteered to do so. Also, as in Elison, the questioning of Made occurred in a public setting, at a highway rest stop, where hunters, motorists, and a camera crew were present to witness the interaction. The questioning also occurred in the presence of, at most, two other wardens at any one time in order to determine his identity and to obtain information confirming or dispelling the wardens’ suspicion that he had illegally harvested the deer in the back of Olson’s pickup and, as the investigation developed, the deer killed in Yellowstone County. Finally, during the investigation, Made was left standing alone while the wardens conversed, followed leads, and wrote up citations. Compare Olson, ¶ 16 (concluding that a custodial interrogation occurred where “there [were] officers everywhere,” and the defendant was not “ever standing *41 alone.”).
¶18 Maile’s detention also occurred at a routine “stop and report” game check station, which is authorized by §§ 87-1-207 and 87-6-218, MCA, and requires all hunters traveling in the direction of a station to stop to allow FWP officers to inspect the licenses and game possessed by hunters. Like the detention of a motorist pursuant to a traffic stop, the detention of a hunter at a game check station is “presumptively temporary and brief.” See Berkemer, 468 U.S. at 437, 104 S. Ct. at 3149. As long as hunters produce a valid license and can otherwise prove that they harvested their game legally, such roadside detentions are short in duration. A hunter’s expectation upon pulling into a game check station is that he will be required to spend some time answering questions and waiting while the warden checks his license and other documents proving that a legal harvest has occurred. He may also expect to be given a citation if he has not comported with the law, but, in the end, will most likely be allowed to continue on his way. See Berkemer, 468 U.S. at 437, 104 S. Ct. at 3149. At no point during Maile’s detention was he informed that his detention would exceed that of a routine “stop and report” game inspection and, indeed, Made was eventually allowed to go on his way after being issued a citation.
¶19 Finally, while we concede that the length of the warden’s investigation and amount of questions the wardens posed to Made exceeds that of a normal roadside investigatory stop, we cannot say that Maile’s detention ripened into a custodial interrogation because the record demonstrates that the wardens kept the scope of inquiry reasonably related to the purpose for which the investigation was initiated. See State v. Larson, 2010 MT 236, ¶ 31, 358 Mont. 156, 243 P.3d 1130. Indeed, it was Maile’s attempts to obfuscate and delay the investigation as well as his failure to answer the wardens’ questions directly and truthfully that continued to confirm the wardens’ suspicions and thus extend the length of the investigation. Furthermore, as shown in the “Wardens” video, Made himself extended his roadside detention by continuing to volunteer additional information and, towards the end of his detention, even asked permission to reinitiate conversation with one of the wardens. It is because of factual circumstances such as these that we have repeatedly and “explicitly declined to define specific time parameters for roadside investigatory stops.” Larson, ¶ 31; see State v. Nelson, 2004 MT 310, ¶ 23, 323 Mont. 510, 101 P.3d 261 (“We have noted that, while law enforcement officers conducting an investigation or investigatory stop should be guided by principles of reasonableness, ‘effective law enforcement requires some latitude to be given to investigating officers *42 to react to and follow up on their observations.’ ”) (quoting State v. Sharp, 217 Mont. 40, 47, 702 P.2d 959, 963 (1985)).
¶20 We conclude that Maile’s roadside detainment at the FWP game check station remained public, routine, and temporary in nature, never exceeding the scope of a wildlife crime investigation. As such, Made was not taken into custody for purposes of Miranda and the statements Made made to the game wardens were admissible against him.
¶21 2. Did the District Court err in affirming the Justice Court’s determination that the admissions Made made were voluntary?
¶22 Made also argues that the confession he made to the FWP game wardens was involuntary under the totality of the circumstances of his interrogation. The Justice Court determined that Made was not intimidated or coerced into admitting to the wardens that he illegally harvested deer in both Carbon County and Yellowstone County.
¶23 While both the Justice Court and the District Court seemed to conflate the analysis of the Miranda issue above with the voluntariness issue addressed here, it is important to note that these are two distinct grounds upon which Made challenges the admissibility of his statements and it is necessary to analyze these discrete issues accordingly.[2] Unlike the Miranda doctrine, which is grounded in the Fifth Amendment’s Self-Incrimination Clause and applied to the states via the Fourteenth Amendment’s Due Process Clause, the United States Supreme Court has “based the rule against admitting coerced confessions primarily, if not exclusively, on notions of due process” under the Fifth and Fourteenth Amendment. Dickerson v. United States, 530 U.S. 428, 433, 120 S. Ct. 2326, 2330 (2000); see State v. Morrisey, 2009 MT 201, ¶¶ 26-30, 351 Mont. 144, 214 P.3d 708. Thus, “where there has been no Miranda violation or the Miranda rule simply does not apply, the defendant may still challenge the admissibility of his statement on due process grounds” under the voluntariness doctrine. Morrisey, ¶ 30. This constitutional protection against involuntary confessions and admissions is codified in statute at § 46-13-301, MCA, and provides the procedure by which a defendant may move to suppress an involuntary confession or admission.[3]
*43 ¶24 “[T]he essential inquiry under the due process voluntariness test is whether the suspect’s will was overborne by the circumstances surrounding the giving of the confession.” Morrisey, ¶ 47 (citing Dickerson, 530 U.S. at 433-34, 120 S. Ct. at 2330-31). “A court must examine the totality of all the surrounding circumstances, including the characteristics of the individual and the details of the interrogation, to determine whether the confession was given freely, voluntarily, and without compulsion or inducement of any sort.” Morrisey, ¶ 47; see Dickerson, 530 U.S. at 434, 120 S. Ct. at 2331. The various factors relevant to this inquiry include:
the defendant’s age, maturity, education, physical condition, and mental health; the defendant’s demeanor, coherence, articulateness, and capacity to make full use of his or her faculties; the defendant’s background and experience, including any prior experience with the criminal justice system and police interrogation; the length, mood, location, and continuity of the questioning; the use of threats, violence, or physical punishment (such as the deprivation of food or sleep); the exertion of improper influence, psychological coercion, deception, or implied or express promises; and whether the police advised the defendant of his or her rights to remain silent and to have counsel present during custodial interrogation.
Morrisey, ¶ 47.
¶25 Made contends that his statements to the wardens were not made voluntarily. He argues that Miranda warnings were not given to him and that the wardens would not let Made leave until they obtained a confession. He claims that the wardens used coercive questioning for over thirty minutes and that the questioning was “aggressive, confrontational, and emphatic.” Made also argues that the wardens “threatened” to bring obstruction of justice charges against him, at which point Made contends he was forced to acquiesce and confess to *44 avoid charges against himself, his daughter, and his fiancé.
¶26 First, the fact that the wardens did not advise Maile of his Miranda rights is not relevant in this case because we have determined that Maile was not required to receive such warnings. Additionally, Maile does not argue, and there is no reason to suggest, that his age, maturity, education, physical condition, mental health, demeanor, coherence, articulateness, capacity, background, or his general and criminal justice experience precluded him from giving a free and voluntary confession. He also does not contend, and the record does not demonstrate, that the wardens engaged in behavior relating to improper influence, psychological coercion, deception,[4] or that they made implied or express promises to him, acted violently toward him, or physically punished him in order to produce a confession. Rather, Maile argues that he felt the compulsion and inducement to confess due to the length, mood, and location of the interrogation, as well as the wardens’ threat of prosecution. We are not persuaded.
¶27 With respect to the location and length of the interrogation, we conclude that, just as the circumstances surrounding Maile’s detainment failed to rise to the level of a custodial interrogation under Miranda, many of the same circumstances surrounding the public, routine, and temporary detainment of Maile support the Justice Court’s finding that his confession was voluntary. The wardens interviewed Maile in public, with other hunters, motorists, and a camera crew witnessing the interrogation. Further, they left Maile standing alone on more than one occasion and allowed him move about freely. At one point, the “Wardens” video shows that he and Olson were even listening to a game on the truck’s radio when one of the wardens approached them. In short, we cannot say that the wardens in any way took advantage of the location of the questioning in an attempt to create a coercive environment.
¶28 As for the length of the interrogation, while the timing and number of questions the wardens posed to Maile weighs slightly in his favor, we have upheld confessions obtained during interrogations lasting much longer than, as Maile contends, the approximately thirty minutes of questioning Maile endured here. See, e.g., Morrisey, ¶ 48 (upholding a confession where the interrogation lasted “roughly three *45 hours during the afternoon, followed closely by two or three hours in the evening”); State v. Reavley, 2003 MT 298, ¶ 27, 318 Mont. 150, 79 P.3d 270 (upholding a confession where the “interview lasted approximately four hours and twenty minutes”). Additionally, the record demonstrates that the wardens’ line of questioning was not only direct and responsive to Maile’s vague and untruthful answers, but that Made himself willingly engaged in, and at times initiated, a running conversation with the wardens.
¶29 With respect to the mood of the interrogation, we concede that, at times, the wardens became increasingly forceful in their questioning and confrontation of Made, particularly when they caught him being untruthful. However, the record demonstrates that, on balance, the wardens remained calm and professional even in the face of Maile’s clear attempts to obfuscate and delay the investigation. Made cites a section of the interrogation where Wardens Heaton and Burroughs confront Made regarding his misleading statements and attempts to change the subject:
Warden Heaton: No, what did I ask you? What did I ask you [gesturing towards Made with four fingers]? I asked you for [Louri’s] phone number or an address and you’re rattlin’ off a bunch of other things here. That’s being uncooperative. Ok. Where is she at? What about Mary? How do I get in touch with Mary?
Made: Probably a phone, but I don’t have that memorized either. I’m just telling you the truth.
Warden Burroughs: Listen, the bullshit is over... and you haven’t been telling the truth [pointing at Made].
Made: Yes, I have.
Warden Burroughs: Then why did Paul tell us the truth? You shot that deer, Louri and Mary Ann were never here today. Now quit lyin’ to me. That’s bullshit.
Made: Ok, whatever. Take the deer, take my license, whatever you are doing, do it.
Warden Burroughs: All we wanna do is find out the truth.
Made: Ok, do what you are doing.
Warden Burroughs: What’s the truth?
Made: The truth is you’re going to do what you wanna do ... you have the badge, I don’t.
Warden Heaton: I’m going to jump in here real quickly. What we’re dealing with here, like I said, we’ve got some issues, we’ve got some problems. Ok, we need to get these straightened up, ok. .... We’ve got wildlife violations. It is a criminal matter, it is a problem. It’s something we can deal with ok? It’s not going to go *46 on your record ... the only people that are going to know about it are other game wardens in the state. The path you’re going down, that’s what we call obstruction of justice. You know what that is? That’s a criminal charge. That stays on your record. Ok, that’s something you can go to jail for....
Made: I’m not doing anything funny ... I’ll help you, fair enough?
Warden Heaton: No. What we need to know is you need to tell us what happened. No more lies.
Made: I am telling you I am not doing anything to obstruct you. Ok, I am not messing with you.
Warden Heaton: So did you shoot the deer?
Made: OK. I am giving you the deer so you can do what you gotta do.
Warden Heaton: Did you shoot the deer? Yes or no.
Made: Yes, to help my daughter.
Warden Burroughs: Was your daughter there today?
Made: No.
Warden Heaton: That’s all we needed to know.
However, despite what Made calls an “aggressive, confrontational, and emphatic” line of questioning, Made remained calm and conversational. He also continued to offer more information as the interrogation continued. At one point, Made asked the wardens “what else do you need from me?” and, towards the end of the check station interrogation, asked W arden Heaton if he could speak with him further in order to “straighten things out.” Considering the entirety of the interaction between the wardens and Made, we conclude that this factor weighs in favor of the State.
¶30 Finally, we must weigh any statements interpreted as threats as part of our totality of the circumstances analysis under the voluntariness doctrine. However, we find no “threat” in this case, where the legal consequences of a suspect’s conduct are pointed out and naturally flow from a truthful and honest course of conduct by the police. We do not think that Warden Heaton’s statement that Made could be subject to obstruction charges is inherently coercive; rather, we conclude that, although he miscited the applicable statute, the warden truthfully informed Made that he could face an additional criminal charge if it was discovered that he made statements in an effort to mislead the warden or hinder the investigation. Merely discussing the potential criminal consequences of such conduct fails to create an unduly coercive environment.
¶31 In sum, based on the totality of the circumstances, we hold that Made’s admissions and confession were voluntary.
*47 CONCLUSION
¶32 Accordingly, Maile’s conviction is affirmed.
JUSTICES SANDEFUR, SHEA and RICE concur.

 Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

 We previously addressed a similar case of conflation of the Miranda doctrine and the voluntariness doctrine in State v. Morrisey, 2009 MT 201, 351 Mont. 144, 214 P.3d 708.

 Section 46-13-301, MCA, states:
(1) A defendant may move to suppress as evidence any confession or admission given by the defendant on the ground that it was involuntary. The motion must be in writing and state facts showing why the confession or admission was *43 involuntary.
(2) If the allegations of the motion state facts that, if true, show that the confession or admission was involuntary, the court shall conduct a hearing into the merits of the motion. The prosecution must prove by a preponderance of the evidence that the confession or admission was voluntary.
(3) The issue of the admissibility of the confession or admission may not be submitted to the jury. If the confession or admission is determined to be admissible, the circumstances surrounding the making of the confession or admission may be submitted to the jury as bearing upon the credibility or the weight to be given to the confession or admission.
(4) If the motion is granted, the confession or admission is not admissible in evidence against the movant at the trial of the case.

 We recognize that, contrary to one of the warden’s contentions, there are no facts in the record to suggest that Maile could have been charged with Obstructing Justice under § 45-7-303, MCA. However, given that Maile does not argue, and we find nothing in the record to suggest, that the warden deceived Maile to obtain his confession, we will not address whether the warden engaged in a deceptive interrogation practice that runs afoul of the United States Constitution.